IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| LABORATORY CORPORATION OF AMERICA HOLDINGS,<br><br>Plaintiff,<br><br>-against-<br><br>WILLIAM G. KEARNS,<br><br>Defendant. | CASE NO. 1:14-CV-1029<br><br>**COMPLAINT** |

Plaintiff Laboratory Corporation of America Holdings ("Plaintiff" or "LabCorp"), by its undersigned counsel, as and for its Complaint against William G. Kearns ("Defendant" or "Kearns"), alleges as follows.

## NATURE OF THE ACTION

1. Plaintiff brings this action against Kearns for a permanent injunction and damages for breach of contract and breach of fiduciary duty caused by defendant Kearns' activities in competition with LabCorp, all in breach of his common law duties and covenants not to compete and not to solicit LabCorp customers with whom he had contact while employed by LabCorp for one year following the termination of his employment at LabCorp.

2. Defendant Kearns is bound by an Employment Contract (the "Contract") with LabCorp that expressly prohibits him, for one year following the termination of his employment from, *inter alia*, (a) owning, investing in or becoming employed by a trade or business involved in the development, licensing, or sale of pre-

NY01\SteiR\3417662.1

implantation genetic diagnosis and testing that competes with LabCorp; and (b) soliciting, either directly or indirectly, customers or prospective customers of LabCorp, with whom he had contact at LabCorp, for the purpose of selling, licensing or providing the same or substantially same services offered and/or provided to customers or potential customers of LabCorp.

3. In breach of his Contract and his fiduciary duty to LabCorp, while still in the employ of LabCorp, Kearns formed a competitive company, AdvaGenix, which engages in the provision of the same pre-implantation genetic diagnosis and testing services and for which he has solicited and is currently soliciting the same customers for the very services he solicited them for at LabCorp.

4. When LabCorp first became suspicious of Kearns' improper conduct, he was placed on administrative leave and later, following an investigation into his activities, he was terminated from LabCorp for cause on November 17, 2014.

5. As a result of Kearns' actions, LabCorp has suffered and will continue to suffer, damages and irreparable harm, including, but not limited to, the loss of business, loss of goodwill, and other damages for which there is no adequate remedy at law.

6. An injunction against any further prohibited activities is necessary to prevent such further harm to LabCorp caused by Kearns' unfair and illegal activity which, if it continues unabated, will result in LabCorp losing customers and goodwill to which Kearns had access by virtue of his employment with LabCorp.

7. Indeed, the Contract in paragraph 11 specifically provides that:

> Employee acknowledges and agrees that because the violation, breach, or threatened breach of . . . [the Non-Solicitation and Non-Compete] of this Contract would result in immediate and irreparable injury to the [LabCorp], [LabCorp] shall be entitled without limitation of remedy, to (a) a temporary and permanent injunction and other equitable relief restraining Employee from activities constituting a violation, breach or threated breach of [the Non-Solicitation and Non-Compete provisions] of this Contract to the fullest extent allowed by law. . . .

## THE PARTIES

8. Plaintiff LabCorp is a corporation organized under the laws of the State of Delaware with its principal place of business located at 358 South Main Street, Burlington, North Carolina.

9. Upon information and belief, defendant Kearns is a resident of the State of Maryland with an address at 18216 McKernon Way, Poolsville, Maryland.

## JURISDICTION, VENUE AND GOVERNING LAW

10. Pursuant to Paragraph 14(c) of the Agreement, the Contract is to be "construed in accordance with and governed by the laws, except choice of law provisions, of the State of North Carolina and shall govern to the exclusion of the laws of any other forum including but not limited to the laws of the State of Maryland."

11. Paragraph 14(c) further provides that:

> Employee hereby consents and submits to the personal jurisdiction in the State of North Carolina. LabCorp and Employee irrevocably waive any objection or defense based on lack of personal jurisdiction, improper venue or forum non-conveniens ….

3

NY01\SteiR\3417662.1

Case 1:14-cv-01029-TDS-JLW   Document 1   Filed 12/09/14   Page 3 of 17

12. This Court has jurisdiction over this action based on diversity of citizenship pursuant to 28 U.S.C. § 1332. The amount in controversy, exclusive of interest and costs, is in excess of $75,000.

13. Venue and jurisdiction is proper in this district under 28 U.S.C. § 1391(a), (b) and (c) because Defendant, either by his direct agreement, and/or by virtue of his close relationship with a signatory to the Agreement, and/or by operation of law, has consented to such jurisdiction pursuant to Paragraph 14(c) of the Contract.

## THE FACTS

**(1) LabCorp's Business**

14. LabCorp provides a variety of medical laboratory tests and services, which it markets and sells to medical professionals around the country.

15. Among its service offerings, LabCorp's Women's Health Segment provides reproductive genetics testing and screening services, including pre-implantation genetic diagnosis and testing, which is a technique used to identify genetic defects in embryos conceived through *in vitro* fertilization (IVF). After testing is performed, one or more of the embryos found to be free of the abnormalities within the limit of the test are transferred to the mother's uterus. The purpose of pre-implantation genetic testing is to improve the likelihood of having a full-term, healthy baby.

16. LabCorp provides other genetic diagnostic services to IVF clinics and women's health care providers such as chromosome analysis, evaluation of products of conception (POC), and carrier screening.

17. The market to service IVF clinics and women's health care providers is highly competitive and LabCorp utilizes various sales strategies and other methods to assist it in maintaining and expanding its customer base for the services it offers.

18. LabCorp's sales strategies and plans are confidential and only shared with those LabCorp employees who require the information to perform their job functions.

**(2) LabCorp Acquires Kearns' Genetic Testing Business**

19. Prior to his employment with LabCorp, Kearns was the owner and operator of the Shady Grove Center for Pre-implantation Genetic Diagnosis ("Shady Grove") in Rockville, Maryland.

20. In or around July 2007, LabCorp entered into an Asset Purchase Agreement to acquire substantially all of the assets of Shady Grove for $3,200,000 plus up to another $800,000 less certain adjustments, with the purpose of expanding its genetic testing services.

21. In connection with the acquisition, Kearns signed the Contract, which contains certain restrictive covenants including covenants not to compete and not to solicit for a limited period of time.

22. The Contract restricts Kearns for a period of twelve (12) months from the date of the termination of his employment from LabCorp from engaging in certain limited competitive activities, which restrictions are designed to protect the goodwill LabCorp has developed with its customers as well as the confidential business information provided to Kearns to assist him in performing his job functions on behalf of LabCorp.

23. Specifically, Paragraph 9 of the Contract provides, in relevant part that Kearns "will not, without the prior written consent of [LabCorp]:"

> (i) directly or indirectly through a subordinate, co-worker, peer, or any other person or entity contact, solicit or communicate with a customer or potential customer of Corporation or its subsidiary or affiliated companies with whom Employee has had contact while employed at Corporation or its subsidiary and affiliated companies for the purpose of (x) offering, selling, licensing or providing the same or substantially similar assays, commercial medical testing or anatomical pathology services offered and/or provided to such customer or potential customer by the Corporation or its subsidiary and affiliated companies or (y) influencing said customer's or potential customer's decision on whether to purchase or use such assays, commercial medical testing or anatomical pathology services offered by the Corporation or its subsidiary and affiliated companies;
>
> * * *
>
> (iii) directly or indirectly own, invest in, consult for, be employed by or otherwise engaged by any person, trade or business either (x) involved in the research and development, licensing, production, distribution, or sale of preimplantation genetic diagnosis and testing that directly competes with the Corporation or any of its subsidiary and affiliated companies in the same geographic markets serviced by them or (y) supplies, services, advises or consults with a person, trade or

NY01\SteiR\3417662.1

business involved in the research and development, licensing, production, distribution, or safe of preimplantation genetic diagnosis and testing that directly competes with the Corporation or any of its subsidiary or affiliated companies in the same geographic markets serviced by them, except that nothing in this Contract shall prohibit Employee from holding not more than a three (3%) of the outstanding shares of a publicly traded company whether or not engaged in business activities that compete with the business activities of the Corporation and its subsidiary and affiliated companies.

24.    The Contract also requires that Kearns not disclose any confidential information related to LabCorp or its business practices, with such information specified to include, among other things, "any confidential, privileged and proprietary information of [LabCorp]."

**(3)    Kearns's Employment Responsibilities at LabCorp**

25.    Prior to his termination on November 17, 2014, Kearns held a senior position in LabCorp's Women's Health Division, specifically, Scientific Director & Business Development for Pre-implantation Genetics.

26.    In his position, Kearns had a variety of duties and responsibilities, including, among others, review and analysis of samples, the provision of genetic counseling, the sales and marketing of LabCorp's pre-implantation genetic diagnostic and testing services, conducting chromosome analysis, evaluation of POC, carrier screening, and traveling to IVF and women's health clinics around the country to make presentations about these offerings and their benefits.  Kearns was also actively engaged in the research and development of new genetic tests for LabCorp as they related to conception.

7

27. In addition to the above described duties, Kearns routinely participated in meetings concerning the formulation and implementation of sales strategies and plans, which included analysis of the activities of and competitive threats from other companies who offer the same or similar products and services as LabCorp.

28. As part of his LabCorp employment, Kearns had access to and was given a variety of confidential information about LabCorp's business, including pricing information, customer account lists, and customer preferences and utilization.

29. The meetings and documents that Kearns was privy to up until his termination included, among other things, critical components of LabCorp's sales plans and strategy.

30. This up to date and proprietary information was invaluable to LabCorp employees like Kearns in successfully performing their job functions and likewise would be invaluable to an employee going to work for a competitor and to any such competitive business. This is because it would allow the former employee to use the information learned at LabCorp to more effectively compete with LabCorp and would afford the competitor an inside look at LabCorp's strategic plans and thus provide it with an unfair business advantage.

31. Kearns' knowledge of the inner workings of LabCorp's business and the direct customer relationships he developed through the use of LabCorp's resources likewise would be invaluable to him and to any competitor of LabCorp on behalf of whom he worked following his employment with LabCorp.

**(4) LabCorp Suspends and Then Terminates Kearns After It Learns He Started A Competing Business While Still Employed At LabCorp**

32. In or around October 2014, LabCorp learned from one of its customers that while on a visit to that customer on what was intended to be LabCorp business, Kearns advised that customer that he was in the process of starting a new business which would offer, among other testing, state-of-the-art pre-implantation genetic testing. Kearns further advised the customer that he intended to resign from LabCorp within the next six (6) months.

33. Upon information and belief, the purpose of Kearns providing the customer with this information was to solicit the customer to use Kearns' new business venture for the services then being provided by LabCorp and which Kearns was responsible for promoting.

34. When LabCorp learned of this incident it began to conduct an investigation and discovered that Kearns had leased space in Rockville, Maryland for the purpose of accommodating laboratory and administrative operations of a genetic testing business. LabCorp further discovered that Kearns was the owner of an entity called AdvaGenix and had even set up an email address, wgkearns@advagenix.com.

35. Kearns was never given permission by LabCorp to solicit its customers for his new business, was never given permission to start a competing business while employed by LabCorp, and was never permitted to use LabCorp's resources to engage in such competitive activities.

36. In or around October 28, 2014, LabCorp personnel interviewed Kearns about what it had learned.

37. During that interview, Kearns falsely claimed that he had leased the space and started the new business for the purpose of benefiting LabCorp. He admitted that his actions in doing this without LabCorp's knowledge constituted poor judgment.

38. LabCorp placed Kearns on administrative leave while it further investigated his activities.

39. During that investigation, LabCorp learned, among things, that Kearns had incorporated AdvaGenix in or around April 2014 and that its stated business purpose was to "provide genetic services for *in vitro* fertilization clinics and to do all things related thereto," and to "provide genetic services for any fetus or individual requiring genetic testing" – the same services he was providing at LabCorp.

40. LabCorp also learned that Kearns had actually begun to provide pre-implantation genetic diagnostic testing for at least one fertility clinic in Texas, which was currently a LabCorp customer for which Kearns had responsibility.

41. During Kearns' suspension, Kearns, through counsel claimed that he was permitted to start a competing business – while he was still employed at LabCorp – under the terms of his Contract because those activities were specifically carved-out of the restrictions in his Contract, which referenced Kearns' ability to engage in business pursuits with respect to a specific 2006 Patent application, titled in the Contract, "Method for In Vitro Fertilization (IVF) and Genetic Testing of Human Embryos for Chromosome

10

Abnormalities, Since Gene Mutations, Segregating Genetic Disorders of Families and Mitochondrial Mutations," filed September 22, 2006 (the "Patent").

42. The carve-out was intended to and plainly only allows Kearns to pursue obtaining a patent from the Patent and Trademark Office ("PTO") for the referenced patent application and, should one be issued, to commercialize the method described therein.

43. The Patent was never issued by the PTO and indeed, on July 30, 2012 the PTO issued a final rejection of the application, and on March 11, 2013 issued a Notice of Abandonment.

44. As of the commencement of Kearns' competing business activities, with the Patent abandoned, none of the competitive activities Kearns was engaging in and which he continues to engage in are "actions, efforts or business pursuits with respect to the Patent," as allowed for in the Contract.

45. Moreover, the prohibited competitive activities Kearns has engaged in and continues to engage in are not those activities set forth in the failed Patent.

46. On November 17, 2014, LabCorp terminated Kearns' employment.

47. On the very same day that Kearns was terminated, he sent an email announcement out claiming he had resigned from LabCorp voluntarily and informed the recipients that:

> I started my own lab called Advagenix. It's all next generation sequencing. We do chromosomes, single gene testing, poc molecular karyotyping with genotyping and we're

11

launching soon preconception carrier testing. We provide shipping kits, etc.

48. The services described above are all services offered by LabCorp and indeed are those that Kearns had been directly involved in offering to LabCorp's customers with whom he had contact. Thus Kearns is, on behalf of his newly formed entity, AdvaGenix, competing with LabCorp in violation of his non-compete, and soliciting customers for the very services he solicited them for at LabCorp, all in violation of his Contract.

49. On November 20, 2014, LabCorp, through counsel, sent a letter to Kearns reminding him of the restrictive covenants contained in his Contract and that his work for AdvaGenix was in breach of that Contract.

50. LabCorp sought assurances that Kearns would honor the terms of the Contract and cease all work for AdvaGenix.

51. To date, Kearns has not provided a written response to LabCorp's letter, but through counsel has maintained that he remains entitled to engage in activities in competition with LabCorp.

## COUNT I

## BREACH OF CONTRACT

52. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 51 as if fully set forth herein.

53. Kearns executed the Contract in which he agreed that, for one year following the termination of his employment with LabCorp, he would not "without the prior written consent of [LabCorp]:"

> (i) directly or indirectly through a subordinate, co-worker, peer, or any other person or entity contact, solicit or communicate with a customer or potential customer of Corporation or its subsidiary or affiliated companies with whom Employee has had contact while employed at Corporation or its subsidiary and affiliated companies for the purpose of (x) offering, selling, licensing or providing the same or substantially similar assays, commercial medical testing or anatomical pathology services offered and/or provided to such customer or potential customer by the Corporation or its subsidiary and affiliated companies or (y) influencing said customer's or potential customer's decision on whether to purchase or use such assays, commercial medical testing or anatomical pathology services offered by the Corporation or its subsidiary and affiliated companies;
>
> * * *
>
> (iii) directly or indirectly own, invest in, consult for, be employed by or otherwise engaged by any person, trade or business either (x) involved in the research and development, licensing, production, distribution, or sale of preimplantation genetic diagnosis and testing that directly competes with the Corporation or any of its subsidiary and affiliated companies in the same geographic markets serviced by them or (y) supplies, services, advises or consults with a person, trade or business involved in the research and development, licensing, production, distribution, or safe of preimplantation genetic diagnosis and testing that directly competes with the Corporation or any of its subsidiary or affiliated companies in the same geographic markets serviced by them, except that nothing in this Contract shall prohibit Employee from holding not more than a three (3%) of the outstanding shares of a publicly traded company whether or not engaged in business activities that compete with the business activities of the Corporation and its subsidiary and affiliated companies.

NY01\SteiR\3417662.1

54. The Contract also requires that Kearns not disclose any confidential information related to LabCorp or its business practices, with such information specified to include:

> privileged and propriety information of [LabCorp] or its subsidiary and affiliated companies or relating to the their business, in any and all forms, including, without limitation, business plans, financial information, trade secrets, know-how, products, methods, techniques, systems, works of authorship, customer lists, projects, plans, proposals, prices, pricing methodology, profit margins, orders, marketing materials, specifications, research formulas, inventions, designs, methods, procedures, processes, or combinations or applications thereof, technology, intellectual property, records, computer software, marketing strategies and sales techniques, forecasts, budgets, names, requirements, materials, documents, and other information regarded by [LabCorp] as proprietary and confidential.

55. The promises made by Kearns were material terms to the Contract, which was executed by Kearns as part of LabCorp's purchase of Shady Grove and Kearns' employment with LabCorp.

56. Kearns is in breach of the Contract by, among other things, owning and being employed by AdvaGenix, a business involved in the research and development, licensing, production, distribution, and sale of pre-implantation genetic diagnosis and testing. AdvaGenix is in competition with LabCorp in the same geographic markets serviced by LabCorp. Kearns is in further breach of the Contract by targeting and soliciting his former LabCorp customers and prospective customers with whom he had contact while employed by LabCorp to purchase the same or substantially similar assays,

14
NY01\SteiR\3417662.1

Case 1:14-cv-01029-TDS-JLW    Document 1    Filed 12/09/14    Page 14 of 17

commercial medical testing or anatomical pathology services offered and/or provided to customers or potential customers of LabCorp by him while he was employed there.

57. Kearns' breach has resulted in damages to Plaintiff in an amount to be proven at trial, but which, upon information and belief, exceeds $75,000.

58. As a result of this breach, Plaintiff has suffered and continues to suffer damages and irreparable harm, including, but not limited to, the loss of business, loss of goodwill, and other damages for which there is no adequate remedy at law.

## COUNT II

## BREACH OF FIDUCIARY DUTY

59. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 58 as if fully set forth herein.

60. By virtue of his position at LabCorp, Kearns owed LabCorp a duty of loyalty, including to not actively compete with LabCorp while employed by LabCorp.

61. Prior to his termination from LabCorp, Kearns, in violation of his duty to LabCorp, did not engage in his best efforts to fulfill his obligations to LabCorp but rather solicited business and provided business services for his newly formed competing company, AdvaGenix, to the detriment of LabCorp.

62. As a result of Kearns' breach of his fiduciary duty to LabCorp, LabCorp has suffered damages in an amount to be proven at trial, but which, upon information and belief, exceeds $75,000.

15

**WHEREFORE**, Plaintiff Laboratory Corporation of America Holdings demands judgment in its favor and against Defendant William G. Kearns as follows:

(a) Granting a permanent injunction enjoining and restraining Defendant Kearns from violating the terms of the Contract by, among other things:

1. directly or indirectly through a subordinate, co-worker, peer, or any other person or entity contacting, soliciting or communicating with a customer or potential customer of LabCorp or its subsidiary or affiliated companies with whom Kearns had contact while employed at LabCorp for the purpose of (a) offering, selling, licensing or providing the same or substantially similar assays, commercial medical testing or anatomical pathology services offered and/or provided to such customer or potential customer by LabCorp or its subsidiary and affiliated companies or (y) influencing said customer's or potential customer's decision on whether to purchase or use such assays, commercial medical testing or anatomical pathology services offered by LabCorp or its subsidiary and affiliated companies; and

2. directly or indirectly owning, investing, consulting for, being employed by or otherwise engaged by any person, trade or business either (x) involved in the research and development, licensing, production, distribution, or sale of preimplantation genetic diagnosis and testing that directly competes with the LabCorp or any of its subsidiary and affiliated companies in the same geographic markets serviced by them or (y) supplies, services, advises or consults with a person, trade or business involved in the research and development, licensing, production, distribution, or safe of preimplantation genetic diagnosis and testing that directly competes with the LabCorp or any of its subsidiary or affiliated companies in the same geographic markets serviced by them,

(b) Awarding compensatory damages to LabCorp in an amount that exceeds $75,000;

(c) Awarding applicable interest to LabCorp on any judgment; and

(d) Awarding such other and further relief as this Court may deem just and appropriate.

## JURY DEMAND

Wherefore Plaintiff demands a trial by jury on the within causes of action.

This the 9th day of December, 2014.

/s/ Patricia T. Bartis
Patricia T. Bartis
North Carolina Bar No. 21212
pattibartis@parkerpoe.com
Jennifer H. Dupuy
NC State Bar No. 37632
jenniferdupuy@parkerpoe.com
Parker Poe Adams & Bernstein LLP
PNC Plaza
301 Fayetteville Street
Raleigh, North Carolina 27601

*Attorneys for Plaintiff*
*Laboratory Corporation of America Holdings*

<u>Of Counsel</u>
Robert Steiner (*pro hac vice* application to be filed)
New York Bar No. 2838621
rsteiner@kelleydrye.com
Kelley Drye & Warren LLP
101 Park Avenue
New York, NY 10178
Telephone: 212.808.7800
Facsimile:  212.808.7897