IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

LABORATORY CORPORATION OF
AMERICA HOLDINGS,

        Plaintiff,

    -against-

WILLIAM G. KEARNS,

        Defendant.

**CASE NO. 1:14-CV-1029**


**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
ITS APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION, AND FOR EXPEDITED DISCOVERY**

Pursuant to Fed. R. Civ. P. 65 and 26, Plaintiff Laboratory Corporation of America Holdings ("LabCorp") submits this Memorandum of Law in support of its Application for a Temporary Restraining Order and Preliminary Injunction and for expedited discovery.

## <u>PRELIMINARY STATEMENT</u>

This application arises out of former LabCorp employee Dr. William G. Kearns' ("Kearns") formation of a business to a provide the same services that he provided on behalf of LabCorp to the same customers. Kearns' actions are in breach of his covenants not to compete with LabCorp for a limited type of testing services and not to solicit its customers, with whom he had contact, for one year following his November 17, 2014 termination. There is no question Kearns is competing with LabCorp. Indeed, he admits as much, but claims that a "carve-out" in his contract which allowed him to pursue a specific patent application, rejected over two years ago and which he has since abandoned, allows him to do so. He is wrong.

Prior to his termination, Kearns held a senior position at LabCorp that provided him wide access to LabCorp's *in vitro* fertilization ("IVF") and women's health clinic customers who utilized LabCorp's preimplantation genetic diagnosis ("PGD") testing and other genetic diagnostic testing services, as well as access to LabCorp's business information relating to those services. Kearns' brazen establishment of his own competing lab, AdvaGenix, to perform identical services – *while still employed by LabCorp* – flies in the face of his restrictive covenants. Furthermore, Kearns' already successful efforts to divert valuable LabCorp clients with whom he had contact to his newly established lab to provide the same

PPAB 2647918v1

services he was responsible for at LabCorp is a plain violation of his non-solicit obligations.

Faced with overwhelming evidence of his actions, Kearns seeks cover in a provision of the Contract which, he alleges, sanctions his illicit business pursuits with AdvaGenix. The provision to which Kearns refers, however, only allowed him to obtain and commercialize a patent application already pending at the time of LabCorp's 2007 acquisition of Kearns' business. The PTO has since flatly rejected that application and he it abandoned it in early 2013. Put simply, without an approved patent or even a pending application there is nothing for Kearns to commercialize and there are no conceivable "actions, efforts or business pursuits with respect to the Patent," allowed for in the Contract, that he can be taking.

Moreover, and notwithstanding the rejection of the patent, the competitive activities that Kearns is currently performing for AdvaGenix are not those described in the failed patent application. Indeed, the scientific testing procedures outlined in the failed patent application are now outdated and have been replaced by more current PGD technologies. Kearns and LabCorp are currently competing with each other to market and sell these services. In addition, Kearns is offering other services unrelated to PGD but which he was responsible for offering at LabCorp – something his non-solicit prohibits him from doing.

Only immediate injunctive relief will stop Kearns' restrictive covenant violations.

## STATEMENT OF FACTS

### LabCorp's Business

LabCorp provides medical laboratory tests and services, which it markets and sells to medical professionals around the country. *See* Declaration of Jeffrey Schmalz ("Schmalz

PPAB 2647918v1

Decl.") at ¶ 3. Among its service offerings, LabCorp's Women's Health Segment provides reproductive genetics testing and screening services, including PGD testing -- a technique used to identify genetic defects in embryos conceived through IVF. *Id.*, ¶ 4.

In addition to PGD, LabCorp provides other genetic diagnostic services to IVF clinics and women's health care providers such as chromosome analysis, evaluation of products of conception (POC), and carrier screening. These services are part of a comprehensive suite of medical and diagnostic testing services that LabCorp offers which are centered around fertility and infertility care and treatment. *Id.*, ¶ 6.

The market to service IVF clinics and women's health care providers is highly competitive and LabCorp relies on the relationships it develops with these providers over the years as well various sales strategies and other business methods to assist it in maintaining and expanding its customer base for the services it offers. LabCorp's sales strategies and plans are confidential and only shared with those LabCorp employees who require the information to perform their job functions. *Id.*, ¶ 7.

## LabCorp Purchases The Shady Grove Laboratory and Employs Kearns

Prior to his employment with LabCorp, Kearns owned and operated the Shady Grove Center for Pre-implantation Genetic Diagnosis ("Shady Grove") in Rockville, Maryland. *Id.*, ¶ 9. In or around July 2007, LabCorp entered into an Asset Purchase Agreement to acquire Shady Grove for $3,200,000 plus an additional potential $800,000 with the purpose of expanding its genetic testing services. Indeed, the purchase was designed, among other

PPAB 2647918v1

things, to acquire the goodwill that Shady Grove had developed with its customers and transfer that goodwill to LabCorp over time. *Id.*, ¶¶ 11-12.

As part of the acquisition of Shady Grove, LabCorp and Kearns entered into an employment contract, which contained certain post-employment obligations to LabCorp, such as his covenant not to compete and not to solicit, as well as his agreement to protect LabCorp's confidential and proprietary business information. *Id.*, Ex. A, ¶¶ 9(a)(i-iii), 7.

The Contract restricts Kearns for a period of twelve (12) months from the date of the termination of his employment from LabCorp from engaging in certain limited competitive activities. These restrictions are designed to protect the goodwill LabCorp has developed with its customers as well as the confidential business information provided to Kearns to assist him in performing his job functions on behalf of LabCorp. Specifically, Paragraph 9 of the Contract provides, in relevant part, that Kearns "will not, without the prior written consent of [LabCorp]:"

> (i) directly or indirectly through a subordinate, co-worker, peer, or any other person or entity contact, solicit or communicate with a customer or potential customer of Corporation or its subsidiary or affiliated companies with whom Employee has had contact while employed at Corporation or its subsidiary and affiliated companies for the purpose of (x) offering, selling, licensing or providing the same or substantially similar assays, commercial medical testing or anatomical pathology services offered and/or provided to such customer or potential customer by the Corporation or its subsidiary and affiliated companies or (y) influencing said customer's or potential customer's decision on whether to purchase or use such assays, commercial medical testing or anatomical pathology services offered by the Corporation or its subsidiary and affiliated companies;

> * * *

> (iii) directly or indirectly own, invest in, consult for, be employed by or otherwise engaged by any person, trade or business either (x) involved in the research and

PPAB 2647918v1

development, licensing, production, distribution, or sale of preimplantation
genetic diagnosis and testing that directly competes with the Corporation or any of
its subsidiary and affiliated companies in the same geographic markets serviced
by them or (y) supplies, services, advises or consults with a person, trade or
business involved in the research and development, licensing, production,
distribution, or safe of preimplantation genetic diagnosis and testing that directly
competes with the Corporation or any of its subsidiary or affiliated companies in
the same geographic markets serviced by them, . . . .

*Id.*, Ex A, ¶ 9(a)(i-iii).

Kearns is also prohibited from disclosing any confidential information related to

LabCorp or its business practices. Paragraph 9(b) of the Contract "carves out" from the

restrictive covenant Kearns' "actions, efforts or business pursuits" with respect to a then

pending patent application referred to in a prior paragraph, and defined as "the Patent". *Id.*,

Ex A, ¶ 9(b).

According to records from the Patent and Trademark Office ("PTO"), after numerous

attempted revisions to it, Kearns received a Notice of Final Rejection of his application on

July 30, 2012. *See* Declaration of Steven Anderson ("Anderson Decl."), Ex C. Thereafter,

no further action was taken by Kearns and the application was marked "Abandoned" on

March 11, 2013. *Id.*, Ex. D. Thus, it has been over two years since Kearns could conceivably

have been engaging in any "actions, efforts or business pursuits with respect to the Patent,"

referenced in the Contract.

**Kearns' Employment at LabCorp**

Prior to his termination, Kearns held the title of Scientific Director & Business

Development for Pre-implantation Genetics and headed a LabCorp team that provided

various counseling and testing services to 30 to 40 IVF and women's health clinics around

-5-

the country who utilized LabCorp's testing services and provided LabCorp with millions of dollars in direct and associated revenue. In his role, Kearns, among other things, reviewed and analyzed samples, provided genetic counseling, sold and marketed LabCorp's PGD services, conducted chromosome analysis, evaluated POC, conducted carrier screening, and traveled to women's health clinics around the country to make presentations about these offerings and their benefits. *See* Schmalz Decl., ¶¶ 23-24.

In addition to these duties, Kearns routinely participated in meetings concerning the implementation of new test offerings, the formulation and implementation of sales strategies and plans, which included discussions of pricing strategies, analysis of competitive threats from other companies who offer the same or similar products and services as LabCorp. In essence, Kearns was an ambassador for the business at LabCorp and, accordingly, LabCorp invested a significant amount of resources into his development of goodwill, including customer relationships, on LabCorp's behalf. *Id.*, ¶¶ 23-27.

**Kearns Forms AdavGenix**

In October 2014, LabCorp learned from one of its clients, the Center for Advanced Reproductive Medicine in Edison, New Jersey ("CARM"), that Kearns had recently visited CARM and informed one of its case managers that he was in the process of starting a new lab that would be performing, among other things, PGD. Kearns further advised CARM that he intended to resign from LabCorp within the next six (6) months. CARM is an important client of LabCorp from whom it derives hundreds of thousands of dollars of revenue per year. This information was extremely unsettling to LabCorp both because

PPAB 2647918v1

Kearns was a current LabCorp employee -- presumably at CARM on LabCorp business when he was providing CARM with information about his plans to start a competing business -- as well as because such actions violated the express terms of Kearns' non-compete and non-solicit provisions contained in his Contract. *Id.*, ¶¶ 29-33.

Upon learning of this development, LabCorp commenced an investigation which revealed that Kearns had indeed incorporated a new business entity under the name "AdvaGenix" and sometime in June of this year had leased space in Rockville, Maryland to house its administrative and laboratory space. Kearns had even set up an email address for the new company: wgkearns@AdvaGenix.com. *Id.*, ¶¶ 31-33.

**The October 28, 2014 Meeting**

On October 28, 2014, Jeff Schmalz, Kearns' supervisor met with Kearns to confront him about what LabCorp had learned. Kearns initially denied establishing a new competitive business and claimed he had simply leased office space to accommodate his continuing research with Johns Hopkins School of Medicine, where he was an Associate Professor. Kearns added that he had hired a former Shady Grove lab tech to assist with his research. *Id.*, ¶¶ 34-35.

When confronted by Mr. Schmalz with additional facts, Kearns claimed he formed AdvaGenix simply to lease office space and then further attempted to persuade Schmalz that he had previously informed Schmalz that he needed more space to conduct his research for Johns Hopkins. When Schmalz denied having had any such conversation, Kearns backtracked and admitted he used bad judgment in renting space without obtaining approval

PPAB 2647918v1

but maintained that the purpose of his claimed expanded research with Johns Hopkins was to "make a better mouse trap" for LabCorp's business. In other words, Kearns maintained that he was personally funding business efforts -- in this case renting office space and hiring an employee -- aimed towards benefiting LabCorp, and with no expectation of reimbursement for the associated costs of doing so. *Id.*, ¶¶ 36-39.

In light of Kearns' simply unbelievable explanation for his efforts, he was placed on administrative leave pending further investigation. In that regard, a forensic review of Kearns' computer confirmed the information LabCorp had received from CARM and the falsity of Kearns' "explanation" for the existence of AdvaGenix. Among other things, LabCorp discovered that Kearns had begun to provide PGD testing for at least one fertility clinic in Texas, which was currently a LabCorp customer for which Kearns had responsibility. *Id.*, ¶¶ 39-42. LabCorp also discovered a copy of AdvaGenix's Operating Agreement "entered into" April 18, 2014, and which described the entity's business purpose as to "provide genetic services for *in vitro* fertilization clinics and all things related thereto" -- the very services Kearns was responsible for providing at LabCorp. *Id.*, Ex. B, ¶ 1.04.

## Kearns Is Terminated And Ramps-Up His Illegal Business Activities

LabCorp elected to terminate Kearns' employment and did so on November 17, 2014. *Id.*, ¶ 43. On the very same day Kearns was terminated, he sent an email to various recipients which confirmed that what he had told Schmalz in October was completely false, stating:

> I started my own lab called Advagenix. It's all next generation
> sequencing. We do chromosomes, single gene testing, poc molecular

-8-

karyotyping with genotyping and we're launching soon preconception carrier testing. We provide shipping kits, etc.

*Id.*, Ex. C. These services are all offered by LabCorp and indeed are those that Kearns had been directly involved in offering to LabCorp's customers with whom he had contact. *Id.*, ¶ 45.

During Kearns' suspension, Kearns, through counsel claimed that he was permitted to start a competing business -- even while still employed at LabCorp -- because his activities were specifically carved out of the restrictions in his Contract, which referenced Kearns' ability to engage in business pursuits with respect to a specific 2006 Patent application, titled in the Contract, "Method for In Vitro Fertilization (IVF) and Genetic Testing of Human Embryos for Chromosome Abnormalities, Since Gene Mutations, Segregating Genetic Disorders of Families and Mitochondrial Mutations," filed September 22, 2006 (the "Patent"). *Id.*, Ex. D. That position takes no account of the fact that Kearns had long since abandoned the patent application and thus none of the competitive activities Kearns was engaging in and which he apparently continues to engage in can be considered "actions, efforts or business pursuits with respect to the Patent," as allowed for in the Contract. *Id.*, ¶ 46

In any event, the prohibited competitive activities Kearns has engaged in and continues to engage in are not those activities set forth in the failed Patent. Indeed, while Kearns' rejected and abandoned application describes some technologies common to PGD testing, the patent application's methodology for performing the specific genetic testing utilizes technologies that were commonly available at that time to detect genetic and

PPAB 2647918v1

chromosomal alternations. Those technologies are now often replaced by more current technologies such as Next Generation Sequencing that are now being widely used to detect genetic and chromosomal alternations and it is these current technologies, which were never part of the patent application, that are likely being employed by Kearns. *See* Anderson Decl. ¶¶ 14-16.

Moreover, Dr. Kearns states that he is currently offering other testing services not included in the patent which are specific for PGD testing. The expanded testing services include chromosome analysis, evaluation of POC, and carrier screening. *Id.*, ¶ 16.

## Kearns Continues His Competitive Efforts, Damaging LabCorp

On November 20, 2014, LabCorp, through counsel, sent a letter to Kearns reminding him of the restrictive covenants contained in his Contract and that his work for AdvaGenix was in breach of that Contract. LabCorp sought assurances that Kearns would honor the terms of the Contract and cease all work for AdvaGenix. *See* Schmalz Decl., Ex. E. Kearns has not provided a written response to LabCorp's letter but continues to maintain that he is entitled to engage in activities in competition with LabCorp. *Id.*, ¶ 49. Moreover, at least one fertility clinic for which Kearns had responsibility while at LabCorp informed LabCorp on November 21, 2014 -- just days after Kearns' termination -- that one of its clients has "elected to continue their care with Dr. Kearns at his new practice." *Id.,* Ex. F.

Kearns had relationships with many LabCorp accounts and was responsible for generating goodwill with these accounts on LabCorp's behalf. Once an account is lost it is difficult to get it back, and indeed, the account may never come back. In addition, LabCorp

PPAB 2647918v1

spends a significant amount of time and resources to develop its confidential sales and marketing strategies, which were shared with Kearns as a high level employee of LabCorp. That strategy is less effective if Kearns is allowed to engage in competitive activities with knowledge of it. He can either use that strategy for his own benefit, or develop methods to counter-act it. Moreover, that information was only provided to Kearns by LabCorp based on the restrictive covenant obligations to which he agreed. Kearns cannot help but benefit from this extremely valuable information in his new business venture. *Id.*, ¶ 54-56.

## ARGUMENT

## POINT I.

## LABCORP IS ENTITLED TO A TRO AND PRELIMINARY INJUNCTION

In order to receive the injunctive relief it seeks, LabCorp must affirmatively establish that it is likely to succeed on the merits in its action against Kearns, that it is likely to suffer irreparable harm as a result of Kearns actions in the absence of preliminary relief, that the balance of equities tips in its favor, and that an injunction against Kearns is in the public interest. *See WV Ass'n. of Club Owners & Fraternal Servs., Inc. v. Musgrave,* 553 F.3d 292, 298 (4th Cir. 2009); *Stuart v. Huff*, 834 F. Supp. 2d 424, 427 (M.D.N.C. 2011).

### A. LabCorp Will Succeed On The Merits Of Its Claims

The Contract executed by Kearns and LabCorp is fully enforceable and LabCorp is likely to prevail on its claim that Kearns has violated the Contract through his establishment of AdvaGenix and his performance of identical, or substantially similar PGD testing. Kearns has further breached the Contract by targeting LabCorp customers and prospective customers

with whom he had contact during his employment at LabCorp and offering the same services he was responsible for offering at LabCorp.

### 1.    The Contract Is Valid And Enforceable

North Carolina will enforce restrictive covenants, such as the non-compete and non-solicit provisions in the Contract at issue, when the covenants are reasonable.[1]  *See ABT, Inc. v. Juszczyk*, 2010 WL 3156542, at *7-8 (W.D.N.C. Aug. 10, 2010).  Indeed, a restrictive covenant between an employer and employee is valid and enforceable if it is (1) in writing, (2) part of the employment contract, (3) based on valuable consideration, (4) reasonable both as to time and territory, and (5) designed to protect a legitimate business interest of the employer.  *See id.* at *7; *United Labs. Inc. v. Kuykendall*, 370 S.E.2d 375, 380 (N.C. 1988).  Additionally, the restrictive covenant must not be against public policy.  *United Labs*, 370 S.E.2d at 380.  All of these requirements are plainly met.

### a.    Kearns Received Valuable Consideration

It cannot be disputed that Kearns entered into his Contract with LabCorp in exchange for new employment.  As part of LabCorp's purchase of Kearns' Shady Grove, he was offered the position of Director, Preimplantation Genetic Services for LabCorp.  *See* Schmalz Decl., ¶ 12.  Kearns accepted that offer and executed the Contract at issue in connection with his hiring.  *Id.*  In North Carolina, "the promise of new employment is valuable consideration and will support an otherwise valid covenant not to compete contained in the initial employment contract."  *Calhoun v. WHA Med. Clinic, PLLC*, 632

---

[1]      Pursuant to ¶ 14(c), the Contract is governed by North Carolina law.  *See* Schmalz Decl., Ex. A,  ¶ 14(c).

PPAB 2647918v1

S.E.2d 563, 571 (N.C. Ct. App. 2006). Moreover, "when a company buys-out another company and offers that company's personnel an employment contract, the offer of new employment constitutes valuable consideration supporting a restrictive covenant in the employment contract." *Id.* at 597, 571; *QSP, Inc. v. Hair*, 566 S.E.2d 851, 854 (N.C. Ct. App. 2002). Thus, LabCorp's offer of employment to Kearns after the purchase of Shady Grove's assets constituted valuable consideration for the execution of the Contract.

### b.    The Scope of the Provisions Are Entirely Reasonable

The scope of the non-compete and non-solicit provisions at issue in this action are entirely reasonable. In North Carolina, a determination of the reasonableness of a restrictive covenant's temporal and geographic scope is based on the totality of the circumstances, such that "[a] longer period of time is acceptable where the geographic restriction is relatively small, and *vice versa*." *Kinesis Advert., Inc. v. Hill*, 652 S.E.2d 284, 294 (N.C. App. 2007).

Here, Kearns worked for LabCorp on a national basis and indeed had responsibly for clients (and potential clients) throughout the country. Thus, the provisions are tailored to protect LabCorp's national interest in specific areas. Indeed, courts routinely find such broad geographic provisions to be reasonable where a former employee's territory was nationwide in scope. *See, e.g.*, *Harwell Enterprises, Inc. v. Heim*, 276 N.C. 475, 481 (1970); *Market Am., Inc. v. Christman-Orth*, 520 S.E.2d 570, 578 (N.C. Ct. App. 1999); *Okuma Am. Corp. v. Bowers*, 638 S.E.2d 617, 620 (N.C. Ct. App. 2007).

Furthermore, the one-year time restriction of the covenants are entirely reasonable. North Carolina courts routinely uphold restrictive covenants that extend for considerably

PPAB 2647918v1

*longer* periods of time. *See, e.g., Philips Elecs. N. Am. Corp. v. Hope*, 631 F. Supp. 2d 705,

716-17 (M.D.N.C. 2009) (two-year non-compete reasonable); *Triangle Leasing Co. v.*

*McMahon*, 393 S.E.2d 854, 858 (N.C. 1990) (two-year non-solicit reasonable). In fact,

Kearns *expressly* acknowledged in the Contract that the scope of the restrictive covenants

were reasonable. *See* Schmalz Decl., Ex. A, ¶ 10.

### c.    **The Covenants Protect Vital LabCorp Interests**

The restrictive covenants in the Contract are necessary to provide LabCorp with a

reasonable degree of protection against Kearns' competitive activities, including, but not

limited to, Kearns' wholesale diversion of LabCorp customers to his AdvaGenix lab.

Indeed, in North Carolina, "[p]rotection of customer relationships and good will against

misappropriation by departing employees is well recognized as a legitimate protectable

interest of the employer." *United Labs.*, 370 S.E.2d at 381. The covenants are also vital to

protecting LabCorp's critical sales and marketing strategies. As a senior member of

LabCorp's Women's Health Division, Kearns was privy to proprietary information relating

to various sales and marketing strategies, including analysis of the activities of and

competitive threats from companies who offer the same or similar products and services as

LabCorp. *See* Schmalz Decl., ¶ 24. This type of information is undoubtedly advantageous

to a competitor of LabCorp. This is *exactly* the type of sensitive information that restrictive

covenants properly seek to protect. *See United Labs.*, 370 S.E.2d at 380-81. If Kearns

wrongfully takes advantage of such information to gain an unfair advantage in a competing

business, "equity will interpose on behalf of the employer and restrain the breach." *Id.*

PPAB 2647918v1

### 2.    Kearns Has Flagrantly Violated The Terms Of The Contract

Kearns cannot credibly contend that AdvaGenix is not performing PGD testing that is identical, or substantially similar to the testing he performed at LabCorp for LabCorp's IVF and women's health clinic customers. *See* Anderson Decl., ¶ 13. In fact, Kearns' activities are confirmed by the very language he crafted into AdvaGenix's Operating Agreement, where he states that AdvaGenix intends to "provide genetic services for in vitro fertilization clinics and to do all things related thereto," and to "provide genetic services for any fetus or individual requiring genetic testing." *See* Schamlz Decl., ¶ 30. Likewise, the evidence shows that Kearns has actively solicited his former LabCorp clients. Kearns' trip to CARM on behalf of AdvaGenix -- while still employed by LabCorp -- clearly establishes that fact. *Id.*, ¶ 27. Further, evidence of Kearns' activities is the email he sent the *very day* he was terminated from LabCorp in which he described the services his new business will be providing, which are the same services he provided at LabCorp. *Id.*, ¶ 42. At least one customer has already informed LabCorp that one of its patients has "elected to continue their care with Dr. Kearns at his new practice."

When called to account for these flagrant violations of his Contract, Kearns first lied to LabCorp and stated that AdvaGenix was merely being used to benefit LabCorp. *Id.*, ¶¶ 26, 33. Recognizing the futility of that cover story, Kearns now contends his activities at AdvaGenix fall under his contractual "carve out" which referenced Kearns' ability to engage in business pursuits with respect to a pending patent application. *Id.*, ¶¶ 44. This effort should fail.

PPAB 2647918v1

The PTO rejected Kearns' patent application in July 2012 -- over two years ago -- and it was marked "abandoned" in March 2013 -- over 18 months ago. Kearns formed AdvaGenix in April 2014 and began his competitive activities thereafter. As such, none of the competitive activities Kearns was engaging in -- and which he continues to engage in -- at AdvaGenix can be considered "actions, efforts or business pursuits with respect to the Patent," as allowed for in the Contract. *See* Anderson Decl., ¶¶ 10-11. Put another way, there is no patent (or application) for which Kearns may engage in "business pursuits."

In any event, the prohibited competitive activities, including the solicitation of business Kearns has engaged in and continues to engage in are not those activities set forth in the failed Patent. *Id.*, ¶ 15. This is partly because the procedures described in the patent application are outdated. *Id.*, ¶¶ 14-15. Indeed, it is highly likely that Kearns and AdvaGenix are now utilizing new and more current technologies that are not, *and never were part of*, the patent application which Kearns now seeks to hide behind. *Id.*, ¶ 15. In addition, Dr. Kearns states that he is currently offering testing services that do not fall under the umbrella of PGD testing at all, including chromosome analysis, evaluation of POC, and carrier screening.

### B. <u>Kearns Will Continue to Cause Irreparable Injury Unless Enjoined</u>

The loss of goodwill and potential loss of customers causes irreparable harm when they result from the breach of a restrictive covenant. *See e.g., Multi-Channel TV Cable Co.*, 22 F.3d 546, 552 (4th Cir. 1994); *ABT, Inc. v. Juszczyk*, 2010 WL 3156542, at *9 (W.D.N.C. Aug. 10, 2010); *Philips Elecs. N. Am. Corp. v. Hope*, 631 F. Supp. 2d 705, 711 (M.D.N.C.

PPAB 2647918v1

2009); *QSP, Inc. v. Hair*, 566 S.E.2d 851, 854 (N.C. Ct. App. 2002).

Moreover, North Carolina courts have held that an employer is irreparably harmed when an employee, restricted by a covenant not to compete, goes to work for a direct competitor. *See Lloyd v. S. Elevator Co., Inc.,* 646 S.E.2d 443 (N.C. Ct. App. 2007). Here, Kearns' actions are all the more egregious as he has not only gone to work for a direct competitor, he has *established* a direct competitor to LabCorp.

Kearns has intimate knowledge of LabCorp's highly confidential sales strategies, business plans, and other information, which he was provided access to based upon the restrictive covenant obligations to which he agreed. *Id.*, ¶ 58. Moreover, Kearns had relationships with many important LabCorp clients. *Id.*, ¶ 57. As a result of this knowledge and these relationships, Kearns' formation of AdvaGenix presents a significant risk that LabCorp will lose its hard-earned customer relationships as well as its edge in the highly competitive PGD testing market. This harm is extremely difficult to quantify. *Id.* If Kearns successfully solicits on behalf of AdvaGenix any prospective customers with whom he had contact during his employment with LabCorp, it would be difficult, if not impossible, to ascertain what percentage of those accounts would have otherwise chosen LabCorp's PGD testing services. Moreover, if he is able to trade on LabCorp's goodwill and its confidential information to successfully solicit former LabCorp clients, any clients he successfully converts represent a potentially *permanent* loss of revenue to LabCorp because once a client is lost, it is difficult to get it back, and indeed, the client may never come back. *Id.* Therefore, it is difficult, if not impossible, to accurately assess the monetary damages to

PPAB 2647918v1

LabCorp resulting from Kearns' violation of his non-solicit.

Courts have routinely found that the sort of intangible property loss at issue here -- *i.e.*, the loss of clients and market share -- is not like economic loss that can be fully compensated by a damage award. It can only be prevented by injunctive relief. *See e.g.*, *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999); *Ecolab Inc. v. Paolo*, 753 F. Supp. 1100, 1110 (E.D.N.Y. 1991).

LabCorp will continue to suffer irreparable harm if Kearns is allowed to continue his breach of the Contract. The issuance of a TRO and preliminary injunction are the only remedies to cease these violations. This is, in fact, the remedy to which Kearns specifically agreed to in his Contract. *See* Schmalz Decl., Ex. A, ¶ 11.

### C. The Balance Of Equities Tips Overwhelmingly In LabCorp's Favor

The balance of hardships in this case is in LabCorp's favor. LabCorp will suffer irreparable harm if Kearns is permitted to compete with LabCorp in violation of his Contract. On the other hand, Kearns will suffer no prejudice whatsoever if the restrictive covenants are enforced. The requested injunction will only bar Kearns from performing acts that he is *already* forbidden by law and contract from doing. Any injury he may now face is simply the result of his failure to act lawfully. In other words:

> To the extent that the defendants suffer significant, and in a sense irreparable, damage from the granting of the preliminary injunction, this harm is a predictable consequence of their willful breach of contract and their misconduct. As such, it is not the type of harm from which we seek to protect a defendant.

*Jiffy Lube Int'l v. Weiss Brothers, Inc.*, 834 F. Supp. 683, 693 (D.N.J. 1993); *see United*

*Labs. Inc. v. Kuykendall*, 370 S.E.2d 375, 380 (N.C. 1988) (by enforcing the contract the court was "'*only requiring the defendants to do what they agreed to do*'" (emphasis added)).

If LabCorp is forced to wait for a resolution of this dispute on the merits, Kearns will continue to significantly -- and, perhaps permanently -- impair LabCorp's business relationships by unlawfully competing on behalf of AdvaGenix. A TRO and preliminary injunction must be issued to prevent such harm.

### D.    The Public Interest Favors A Preliminary Injunction In This Case

The "public interest favors the protection of confidential business information and the enforcement of valid contracts." *ABT, Inc. v. Juszczyk*, 2010 WL 3156542, at *9 (W.D.N.C. Aug. 10, 2010). As the North Carolina Supreme Court stated in *United Labs. Inc. v. Kuykendall*, "[The law] favors the enforcement of contracts intended to protect legitimate interests. It is as much a matter of public concern to see that valid [covenants] are observed as it is to frustrate oppressive ones. 370 S.E.2d 375, 380 (N.C. 1988).

## POINT II.

## LABCORP IS ENTITLED TO EXPEDITED DISCOVERY

To the extent Kearns contests LabCorp's recitation of the facts, LabCorp moves for expedited discovery of Kearns' activities on behalf of AdvaGenix pursuant to Federal Rule of Civil Procedure 26(d). Such discovery is commonly allowed where , as here, preliminary injunctive relief is sought. *See CIENA Corp. v. Jarrard*, 203 F.3d 312, 320 (4th Cir. 2000).

Courts in this Circuit apply a flexible "good cause" or "reasonableness" standard in determining whether expedited discovery is appropriate:

PPAB 2647918v1

> [W]here plaintiff requests expedited discovery in preparation for a preliminary injunction determination, an expedited discovery test limited strictly to the *Notaro* [preliminary injunction] factors is not appropriate. Rather, a standard based upon reasonableness or good cause, taking into account the totality of the circumstances, is more in keeping with discretion bestowed upon the court in the Federal Rules of Civil Procedure.

*Dimension Data N. Am., Inc. v. NetStar-1, Inc.*, 226 F.R.D. 528, 531 (E.D.N.C. 2005).

Here, LabCorp has presented sufficient evidence to support issuance of a TRO and preliminary injunction. However, should Kearns dispute any of this evidence, expedited discovery would be appropriate for the Court's resolution of factual disputes prior to the entry of preliminary injunctive relief. Specifically, LabCorp seeks information sufficient to establish that Kearns is currently conducting PGD testing in violation of his non-compete and has solicited LabCorp customers in violation of his non-solicit. Kearns, and non-party AdvaGenix, would not be prejudiced if ordered to produce the requested information on an expedited basis. Because Kearns has only recently established AdvaGenix, recollections and records will be fresh and easily obtained. Indeed, there would be practically no disruption to Kearns or AdvanGenix by the relief requested herein.

Accordingly, LabCorp should be allowed the following expedited discovery:

- pursuant to Fed. R. Civ. P. 30(b)(1), the deposition of Kearns;
- all documents and/or communications concerning the business activities of AdvaGenix, including but not limited to documents sufficient to demonstrate the testing AdvaGenix has performed and is continuing to perform;
- all documents concerning the solicitation of clients by or on behalf of AdvaGenix;
- all documents concerning the sales and marketing activity of AdvaGenix since its incorporation; and
- discovery into any other factual defenses offered by Kearns to the relief requested.

PPAB 2647918v1

## CONCLUSION

For all the reasons set forth above, LabCorp's Application for a TRO and Preliminary Injunction, and for expedited discovery, should be granted in all respects.

Dated: December 9, 2014

/s/ Patricia T. Bartis
Patricia T. Bartis
North Carolina Bar No. 21212
pattibartis@parkerpoe.com
Jennifer H. Dupuy
NC State Bar No. 37632
jenniferdupuy@parkerpoe.com
Parker Poe Adams & Bernstein LLP
PNC Plaza
301 Fayetteville Street
Raleigh, North Carolina 27601

/s/ Robert Steiner
Robert Steiner
New York Bar No. 2838621
rsteiner@kelleydrye.com

Kelley Drye & Warren LLP
101 Park Avenue
New York, NY 10178
Telephone: 212.808.7800
Facsimile: 212.808.7897

*Attorneys for Plaintiff*
*Laboratory Corporation of America Holdings*

PPAB 2647918v1

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that the foregoing **PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION, AND FOR EXPEDITED DISCOVERY** was electronically filed with the Clerk of the Court using the CM/ECF system and a copy was served on Defendant by FedEx, addressed as follows:

        William G. Kearns
        18216 McKernon Way
        Poolsville, Maryland 20837

This 9th day of December, 2014.

                              <u>/s/ Patricia T. Bartis</u>
                              Patricia T. Bartis
                              North Carolina Bar No. 21212
                              pattibartis@parkerpoe.com
                              Parker Poe Adams & Bernstein LLP
                              PNC Plaza
                              301 Fayetteville Street
                              Raleigh, North Carolina 27601

PPAB 2647918v1