IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

LABORATORY CORPORATION OF
AMERICA HOLDINGS,

    Plaintiff,

   -against-

WILLIAM G. KEARNS,

    Defendant.

CASE NO. 1:14-cv-01029-TDS-JLW

## DR. WILLIAM G. KEARNS'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR A PRELIMINARY INJUNCTION

Maury S. Epner
Selzer Gurvitch Rabin Wertheimer
Polott & Obecny, PC
4416 East West Highway, Suite 400
Bethesda, Maryland 20814-4568
(301) 986-9600
Email:  mepner@sgrwlaw.com

Mark Vasco (N.C. Bar #27048)
mark.vasco@bryancave.com
Margaret K. Thies (N.C. Bar #39801)
peggy.thies@bryancave.com
BRYAN CAVE LLP
One Wells Fargo Center
301 S. College Street, Suite 3900
Charlotte, NC 28202
Tel:  (704) 749-8999
Fax: (704) 749-8990

The defendant, Dr. William G. Kearns, is a distinguished and highly respected geneticist, who specializes in preimplantation genetic testing. This case concerns a restrictive covenant that, while facially overbroad and unenforceable, is also limited by an unusual exception allowing Dr. Kearns to undertake the very work he is currently pursuing. For these reasons, the pending motion of the plaintiff, Laboratory Corporation of America Holdings ("LabCorp"), for a preliminary injunction should be denied.

## FACTUAL SUMMARY

Dr. Kearns is an associate professor, specializing in genetics, at the Johns Hopkins University School of Medicine ("JHUM") in Baltimore, Maryland. Ex. 1 at ¶ 1. In 2002, Dr. Kearns became a 7% owner in the Shady Grove Center for Preimplantation Genetics (the "Shady Grove Center") in Rockville, Maryland. *Id.* at ¶ 5. There, he undertook research in his specialized field—preimplantation genetic diagnosis ("PGD")—and also trained JHUM students and fellows. *Id.* at ¶ 4, 33. He also directed the Shady Grove Center's clinical PGD business. *Id.* at 5.

PGD is the analysis of the DNA of newly-formed embryos created *in vitro*, or outside the mother's womb, in a laboratory. Ex. 1 at ¶ 7. PGD assesses whether genetic abnormalities exist that counsel against embryo transfer. Ex. 1 at ¶ 8. At one time, PGD technology was limited, which led to many failures to identify genetic abnormalities, resulting in a high rate of miscarriage or failure to achieve a pregnancy. *Id.* at ¶ 9. In an effort to overcome these limitations, Dr. Kearns and a colleague, Dr. Richard Leach, undertook intensive research beginning in around 2003. *Id.* at ¶ 10.

1

By late 2006, Drs. Kearns and Leach had invented a process—akin to a very complex recipe having scores of individual steps—that vastly improved PGD's reliability. Ex. 1 at ¶ 11-15. They described their invention in a Provisional Patent Application ("the Provisional"), Ex. 1-A, filed in September 2006, entitled "Method for in vitro fertilization (IVF) and genetic testing of human embryos for chromosome abnormalities, single gene mutations, segregating genetic disorders in families, and mitochondrial mutations." Ex. 1 at ¶ 11.

In 2007, LabCorp decided to acquire the Shady Grove Center. Ex. 1 at ¶ 18; *see also* Ex. 1-B, 1-C. Initially, it insisted that Dr. Kearns sign a broad trio of restrictive covenants, Ex. 1-D at ¶¶ 9(a)(i)–(iii), but he refused, recognizing that doing so would prevent him from conducting the work described in the Provisional were he ever to resign from or be fired by LabCorp. Ex. 1 at ¶ 19. To surmount this hurdle, the parties added a broadly-worded exception to LabCorp's standard non-competition agreement that allowed Dr. Kearns to undertake any "actions, efforts, or business pursuits with respect to the" Provisional. *Id.* at ¶ 20, 24-25; Ex. 1-D at ¶ 9(b).

Drs. Kearns and Leach filed a permanent patent application in September 2007, and thereafter, for the next five years, they pursued a grant of exclusivity for their invention. Ex. 1 at ¶ 27. By 2012, however, the expense became too great for Drs. Kearns and Leach to bear on their own (LabCorp having refused from the outset to share any of the expense, reasoning that it already derived all the benefit of the invention by virtue of Dr. Kearns's clinical work), so they abandoned the effort. *Id.* at ¶ 29.

PGDOCS\6400937

In January 2014, LabCorp stunned Dr. Kearns when it revealed that it would close his Rockville lab several months later and henceforth refer all of its PGD business to a New Jersey contract lab ("the contract lab"). *Id.* at ¶ 31. Rather than resign right away and imperil the transition of LabCorp's PGD business to the contract lab, Dr. Kearns agreed to stay on and manage the transition. *Id.* at ¶ 32. But, recognizing that after his LabCorp lab in Rockville was closed he would have no place to continue his research or train his students and fellows, he formed a new entity, AdvaGenix LLC, and made plans for AdvaGenix to open a new lab once the LabCorp facility was shuttered in May 2014. *Id.* at ¶ 33, 38. Dr. Kearns also planned to use the AdvaGenix lab to conduct a commercial PGD business at some future point—consistent with his invention and the exception to the restrictive covenants in his employment agreement—once the transition of LabCorp's PGD business to the contract lab was completed. Ex. 1 at ¶ 34.

Shortly after LabCorp closed its Rockville lab, a problem arose that resulted in the contract lab's refusal to complete certain time-sensitive PGD cases. Ex. 1 at ¶ 39. Dr. Kearns revealed the existence of his new clinical lab to his supervisor, Jeffrey Schmalz, and agreed to complete the cases himself and avert the crisis. *Id.* at ¶ 40, 44.

By mid-summer 2014, a number of clinics complained to Dr. Kearns that the contract lab was either unwilling or unable to perform certain difficult PGD cases and that, henceforth, they would refuse to send these cases to the contract lab. Ex. 1 at ¶ 41-42. Although Dr. Kearns repeatedly attempted to persuade these clinics to reverse their decisions, they refused, and asked Dr. Kearns himself to undertake the cases. *Id.* at ¶ 42.

PGDOCS\6400937

At their request, then, he completed these cases; cases that would not have gone to the contract lab whether AdvaGenix undertook them or not. *Id.* at ¶ 42-43.

In late October 2014, Mr. Schmalz summoned Dr. Kearns to a meeting, also attended by a senior LabCorp HR manager. Ex. 1 at ¶ 45. Mr. Schmalz accused Dr. Kearns of hiding his formation of the AdvaGenix lab and of competing with LabCorp in violation of his restrictive covenant. *Id.* Chagrined at the false accusations, Dr. Kearns reminded Mr. Schmalz that he had disclosed the existence of his new lab to Mr. Schmalz many months before, when Dr. Kearns had offered, and Mr. Schmalz had approved, the new lab's completion of certain time-sensitive PGD cases that the contract lab refused to do. *Id.* Dr. Kearns also reminded Mr. Schmalz and the HR manager that his new laboratory did not violate his non-compete, because that covenant explicitly permitted him to perform PGD so long as he followed the process he had invented and described in the Provisional. *Id.* at ¶ 47. At this point, looking very confused, Mr. Schmalz and the HR manager dismissed Dr. Kearns and advised him that he was being placed on administrative leave with pay. *Id.* Three weeks later, LabCorp terminated Dr. Kearns, asserting—improperly and in breach of his employment agreement—that his termination was for cause. Ex. 1 at ¶ 49.

## DISCUSSION

### I.     LabCorp's Burden in seeking a Preliminary Injunction

The issuance of a preliminary injunction is "an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited

PGDOCS\6400937

circumstances which clearly demand it." *Centro Tepeyac v. Montgomery Cnty.,* 722 F.3d 184, 188 (4th Cir. 2013) (*en banc*) (citation omitted); *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 22, 24 (2008). Before LabCorp can obtain a preliminary injunction, it must make a "clear showing" that (1) it is likely to succeed on the merits of its claims; (2) it is likely to suffer irreparable harm absent an injunction; (3) the balance of the equities tips in its favor; and (4) an injunction is in the public interest. *Winter,* 555 U.S at 20, 22; *Dewhurst v. Century Aluminum Co.,* 649 F.3d 287, 290 (4th Cir. 2011). LabCorp must satisfy all four requirements before relief will be granted. *Real Truth About Obama, Inc. v. Federal Election Comm'n,* 575 F.3d 342, 346 (4th Cir. 2009), *vacated on other grounds by* 559 U.S. 1089 (2010). Moreover, it is not enough that LabCorp identifies a grave or serious question for litigation; it must make a "clear" demonstration it will "likely" succeed on the merits. *Id.* at 346–47.

Here, LabCorp cannot satisfy all four conditions precedent to the grant of extraordinary injunctive relief. Indeed, LabCorp cannot make a "clear showing" as to *any* of the four requirements. As such, its motion should be denied.

## II.    LabCorp Cannot Demonstrate a Likelihood of Success on the Merits

LabCorp's motion for a preliminary injunction fails for two independent reasons. First, the restrictive covenants LabCorp seeks to enforce are limited by a clearly-worded exception; one that was intended to avoid the very dispute currently before the Court. Ex. 1-D at ¶ 9(b). And second, under well-established North Carolina law, LabCorp's restrictive covenants are in any event facially overbroad and hence unenforceable.

PGDOCS\6400937

### A. Dr. Kearns's Employment Contract Expressly Permits Him to Compete with LabCorp by Performing PGD in Accordance with the Process Described in the Provisional Patent Application

When LabCorp acquired the Shady Grove Center in July 2007, LabCorp initially demanded that Dr. Kearns enter into an extensive, three-part restrictive covenant. Ex. 1 at ¶ 19. Discomfited with the breadth of the restrictions, Dr. Kearns insisted on an exception ("the patent carve-out") that allowed him to pursue PGD according to the process, described in the Provisional, that he and Dr. Leach had invented. *Id.* at ¶ 20-21. Accordingly, LabCorp and Dr. Kearns agreed that the restrictive covenants in "Paragraphs 9(a)(i) through 9(a)(iii) [of the Employment Contract] shall not apply to [Dr. Kearns's] actions, efforts or business pursuits *with respect to* the" Provisional. Ex. 1-D, ¶ 9(b) (emphasis added).[1]

When contract language is clear and unambiguous, North Carolina courts will not look beyond the terms of the contract to determine the parties' intent, but instead will construe the agreement as a matter of law. *Lynn v. Lynn*, 689 S.E.2d 198, 205 (N.C. App. 2010); *Salvaggio v. New Breed Transfer Corp.*, 564 S.E.2d 641, 643 (N.C. App. 2002). Where the language of the contract is clear, the court must enforce the contract as written.

---

[1] An identical "carve-out," for "actions, efforts and business pursuits with respect to the" Provisional, also modified Dr. Kearns's promise, in paragraph 1(a) of his Employment Contract, to devote "his full time . . . and attention to" LabCorp business. Ex. 1-D, ¶ 1(a). Similarly, Dr. Kearns also negotiated a "carve-out" to the restrictive covenants that accompanied LabCorp's agreement to acquire the Shady Grove Center, that explicitly allowed Dr. Kearns to "develop[], market[], conduct[] clinical trials, and provid[e] ongoing assistance in the development of the [Provisional] . . . *as well as all* products, licenses, royalties, profits and *processes derived from or there from*," Ex.1-C, ¶ 2 (emphasis added).

*Salvaggio*, 564 S.E.2d at 643. Put another way, "words in a contract will be given their common or normal meaning unless circumstances show a special meaning should be attached to them." *Nat'l League of Junior Cotillions, Inc. v. Porter*, No. 3:06-cv-508-RJC, 2007 WL 2316823, at *4 (W.D.N.C. Aug. 9, 2007).

Here, the "common or normal meaning" of the phrase "with respect to"—upon which a proper construction of Dr. Kearns's patent carve-out depends—is clear. As the U.S. Court of Appeals for the First Circuit has held:

> Dictionaries describe the phrase "with respect to" as synonymous with the phrase "with reference or regard to something" . . . . So, too, courts describe the phrase "with respect to" as synonymous with the phrases "with reference to," "relating to," "in connection with," and "associated with," and they have held such phrases to be *broader in scope* than the term "arising out of," to be *broader* than the concept of a causal connection, and to mean simply "connected by reason of an established or discoverable relation."

*Huffington v. T.C. Group, LLC,* 637 F.3d 18, 21-22 (1st Cir. 2011) (citations omitted; emphasis added); *see also Forshey v. Principi*, 284 F.3d 1335, 1350 (Fed. Cir. 2002) (*en banc*) ("with respect to" means "relates to" or "concerns").

In light of the intentionally "broad[]" language that the parties chose for describing Dr. Kearns's authorized activities, it is plain that the "business pursuit" of conducting PGD according to the very process described in the Provisional is "related to" or "associated with" the Provisional; any other construction would do violence to the plain words the parties chose. *See* Ex. 1-D, ¶ 9(b). As such, the restrictive covenants in Dr. Kearns's Employment Agreement do not apply to his current activities with AdvaGenix.

LabCorp, however, baldly claims (Mot. 15-16) that Dr. Kearns's decision to abandon the patent application process short of actually receiving a patent somehow negated this exception. Neither the plain language of the parties' agreement nor common sense supports this claim.

Had LabCorp intended to condition the viability of Dr. Kearns's patent carve-out on his successful acquisition of a patent, LabCorp's lawyers could easily have said so in the Employment Contract. LabCorp, however, points to nothing therein that even hints that either party ever intended for the patent carve-out to apply only so long as Drs. Kearns and Leach prosecuted their patent application to a successful outcome. LabCorp simply states its position as an *ipse dixit*.[2]

Indeed, it is clear that LabCorp did *not* so intend. When LabCorp closed the Rockville lab in May 2014, it and Dr. Kearns amended his Employment Contract. Ex. 1 at ¶ 36; Ex. 1-E. The Amendment made four changes: it deleted and replaced three paragraphs from the original 2007 contract, relating to Dr. Kearns's job description, his base salary, and his bonus formula; and it deleted, but did not replace, paragraph 4(b) of the original contract, as that provision had become obsolete. Ex. 1-E at ¶ 1-4.

---

[2] The language of the patent carve-out unambiguously permits Dr. Kearns to undertake PGD according to the process described in the Provisional. Ex. 1-D, ¶ 9(b). But, even if the carve-out were less clear than it is, such ambiguity would still compel denial of preliminary injunctive relief. *Novacare Orthotics & Prosthetics East, Inc. v. Speelman*, 528 S.E.2d 918, 921-22 (N.C. App. 2000) (where language of non-compete deemed ambiguous, "we hold that plaintiff has not made the requisite showing that it is likely to succeed on the merits with respect to the claim seeking enforcement the covenant").

PGDOCS\6400937

Notably, the Amendment was silent on the subject of Dr. Kearns's restrictive covenants and the exception thereto for his pursuits related to the Provisional. *See* Ex. 1-E at ¶ 5. By May 2014, however, Drs. Kearns and Leach had long since abandoned their pursuit of a patent. Ex. 1 at ¶ 29. Thus, if LabCorp really believed that Dr. Kearns's failure to obtain a patent negated his right to engage in PGD according to the process described in the Provisional, then LabCorp would have included a provision in the Amendment, deleting but not replacing the patent carve-out, just as it deleted but did not replace a different paragraph of the original contract that had become obsolete. *See* Ex. 1-E at ¶ 4. That LabCorp did not do so refutes its claim that Dr. Kearns's right to pursue PGD, consistent with the process described in the Provisional, somehow expired when Dr. Kearns chose not to continue his pursuit of a patent.

Common sense, moreover, points to the same conclusion. Any patent application, including the Provisional, does two principal things: it describes an invention and it seeks a grant, from the United States government, of exclusive rights with respect to that invention. *See, e.g.*, 35 U.S.C. 154(a)(1). In arguing that Dr. Kearns's failure to obtain a patent *ipso facto* vitiates the carve-out, LabCorp focuses exclusively on the second and ignores the first. The Provisional described Dr. Kearns's invention and, to this day, he still applies that process to the PGD testing he undertakes for clinical clients and patients. Ex. 1 at ¶ 16, 29. That he does not have a patent covering that process neither voids the process nor renders it invalid or ineffective. The lack of a patent means only that Dr. Kearns cannot stop anyone else—including LabCorp, or the contract lab—from copying

PGDOCS\6400937

his process with impunity. Thus, there is no merit to the claim that Dr. Kearns's decision to forego the pursuit of exclusive rights to his invention affects his separate contractual right to engage in "business pursuits" related to the Provisional.[3]

LabCorp also argues (Mot. 16) that, if the carve-out allows Dr. Kearns to apply the process he invented to the PGD cases he currently undertakes, then the exception effectively swallows the rule and renders his restrictive covenants meaningless. This is incorrect. As Dr. Kearns testified, his carve-out only permits him to undertake PGD according to the process described in the Provisional. Ex. 2 at 242, 244. Although LabCorp claims that there is "no other way" to undertake PGD besides Dr. Kearns's invention, LabCorp is misinformed. In fact, there are at least two other processes for undertaking PGD that are currently either in use or in development and described in the relevant scientific and medical literature. Ex. 3 at ¶ 9. Assuming it is otherwise valid, Dr.

---

[3] Because its argument that the carve-out no longer applies is so weak, LabCorp instead resorts to the timeworn tactic of character assassination. Seeded throughout its brief are claims that Dr. Kearns lied about and tried to hide his new lab, that he currently offers genetic services not described in the Provisional, and that he personally benefits from confidential LabCorp information. Each of these claims is false. Dr. Kearns told Mr. Schmalz about his lab, and not simply that it was a "research" lab. Ex. 1 at ¶ 33, 40, 44; Ex. 2 at 195-98. Moreover, he authorized a press release when the new lab opened, that prominently featured both his and AdvaGenix's names. Ex. 2 at 202-03. Dr. Kearns does *not* currently offer any services not described in the Provisional. *Id*. at 149, 181. And his supposed "intimate knowledge" of "highly confidential" sales or marketing information is a myth; he rarely discussed these issues and, when he did, the discussions concerned how he had solved problems, or priced services before LabCorp acquired the Shady Grove Center. Ex. 2 at 102-107. Particularly unsupported is the notion that Dr. Kearns somehow benefits from "confidential" pricing strategies, as LabCorp's pricing—like the pricing of every PGD clinic—is well known in the industry. *Id*. at 117.

PGDOCS\6400937

Kearns's non-compete would still prevent him from undertaking PGD according to these processes. Ex. 2 at 244, 260-62.

Finally, LabCorp argues (Mot. 17) that, because Dr. Kearns currently uses two different methods interchangeably for obtaining test results from the genetic material he collects as a result of his PGD process—only one of which was mentioned by name in the Provisional—he has somehow departed from that process and the patent carve-out no longer applies. This argument, which is premised on another fundamental misunderstanding of the relevant science and technology by LabCorp, lacks all merit.

The invention described in the Provisional was one, having many steps, that achieved what was then a novel process for removing an embryonic cell, applying sterile techniques to avoid contamination, producing many copies of the genomic DNA derived from the embryonic cell and, finally, identifying genomic variations in the embryo that would counsel against embryo transfer. Ex. 3 at ¶¶ 5-7. Today, the process invented by Drs. Kearns and Leach and described in the Provisional has become a leading standard throughout the world for undertaking PGD. *Id.* at ¶ 13.

At the very end of the process Drs. Kearns and Leach invented and described in the Provisional, they identified a particular assay platform, or testing methodology, that they were able to employ, for the very first time, in analyzing the structure of the embryonic genome. Ex. 1 at ¶ 15; Ex. 1-A at 67. That testing methodology is known as "array based genotyping" or "microarray." Ex. 3 at ¶ 14.

PGDOCS\6400937

At AdvaGenix, Dr. Kearns employs the microarray method addressed in the Provisional, as well as a second, newer methodology, known as "next-generation sequencing," which was not mentioned by name in the Provisional. Ex. 1 at ¶ 16. Both testing methodologies, however, do exactly the same thing, and they do it at essentially the same speed and with equally high degrees of reliability. Ex. 3 at ¶ 15. As Dr. Leach explains, for LabCorp to suggest that employing next-generation sequencing materially deviates from the process described in the Provisional—a process that *he* invented—is "like saying the wheat harvested from a field using an International Harvester combine is different from wheat harvested from a field using a John Deere combine. The machines may be different, but the goals, methods, approach and everything else are the same." *Id*. at ¶ 16. LabCorp, in short, is quite *unlikely* to succeed on the merits of its claim that Dr. Kearns exceeded the "broad[]" bounds of his permitted conduct under the carve-out.[4]

## B. The Non-Compete and Non-Solicitation Covenants In Any Event Are Overbroad and Unenforceable

Although LabCorp claims that Dr. Kearns violated the non-compete and non-solicitation covenants in his Employment Contract, it is clear that both restrictive covenants are overbroad and hence unenforceable under settled North Carolina law.

---

[4] Even if LabCorp's testing method argument had merit, Dr. Kearns would still be permitted to undertake PGD employing the "microarray" testing platform he currently applies in certain of his cases. He would simply do so, during the restricted period, as his exclusive testing method.

PGDOCS\6400937

1.  **The Non-Compete**

"Covenants not to compete between an employer and employee are 'not viewed favorably'" in North Carolina. *Farr Assocs. v. Baskin,* 530 S.E.2d 878, 881 (N.C. App. 2000). The party seeking enforcement of a restrictive covenant has the burden of proving the reasonableness of the agreement. *Hartman v. W.H. Odell and Assocs., Inc.,* 450 S.E.2d 912, 916 (N.C. App. 1994).

     a.  **LabCorp Has No Legitimate Business Interest In Prohibiting Dr. Kearns From Working For A Competitor In Every Possible Capacity**

It is settled in North Carolina that, "[t]o be valid, the restrictions on the employee's future employability by others must be no wider in scope than is necessary to protect the business of the employer." *VisionAIR, Inc. v. James*, 606 S.E.2d 359, 362-63 (N.C. App. 2004) (citations and quotations omitted). Thus, "[i]f a non-compete covenant is too broad to be a reasonable protection to the employer's business . . . *[t]he courts will not rewrite [it] but will simply not enforce it*." *Id.* (quoting *Whittaker Gen. Med. Corp. v. Daniel,* 324 N.C. 523, 528 (1989)) (emphasis added).

Under these principles, "[w]here a covenant requires an employee to have no association whatsoever with any business irrespective of whether he or she would be in a position to compete or divulge protected information, the covenant is overbroad." *Asheboro Paper and Packaging, Inc. v. Dickinson,* 599 F.Supp.2d 664, 674 (M.D.N.C. 2009) (Schroeder, J.). Put another way, "restrictive covenants are unenforceable where they prohibit the employee from engaging in future work that is distinct from the duties

13

actually performed by the employee." *Medical Staffing Network v. Ridgeway,* 670 S.E.2d 321, 327 (N.C. App. 2009). In contrast, restrictions limited to "barring an employee from working in an identical position for a direct competitor are valid and enforceable." *Id.* (citing *Precision Walls, Inc. v. Servie,* 568 S.E.2d 267, 273 (N.C. App. 2002)).

North Carolina courts "have held on numerous occasions that covenants restricting an employee from working in a capacity unrelated to that in which he or she worked for the employer are generally overbroad and unenforceable." *CopyPro, Inc. v. Musgrove,* 754 S.E.2d 188, 192-93 (N.C. App. 2014) (collecting cases); *accord Horner Int'l Co. v. McKoy,* 754 S.E.2d 852, 857 (N.C. App. 2014). Here, the non-compete seeks to preclude Dr. Kearns not only from competing with LabCorp in the field of PGD, but also from working for a competitor in *any* capacity; even, for example, as a custodian or IT manager. *See* Ex. 1-D at ¶ 9(a)(iii). Additionally, the covenant precludes Dr. Kearns from working for any person, trade or business that "supplies, services, advises or consults with" a PGD competitor. *Id.* Thus, for example, it prohibits Dr. Kearns from opening a business that provides custodial services or IT consulting to a PGD competitor of LabCorp. *See id.* For these reasons, the non-compete is unenforceable in North Carolina.

The lone North Carolina decision upholding a non-competition agreement that barred a former employee from working for a competitor in any capacity, *Precision Walls, supra,* has since been limited by the North Carolina courts to its specific facts. *See, e.g.*, *Horner Int'l,* 754 S.E.2d at 857 ("it is the broad sweep of the activities covered by the [non-compete] which renders the agreement overbroad and thus unenforceable.

14

Accordingly, [*Precisions Walls, Inc.* is] largely inapposite"); *VisionAIR*, 606 S.E.2d at 362 n. 1; *Asheboro Paper & Packaging*, 599 F. Supp. 2d at 675 ("It is difficult to square [*Precision Walls*] cleanly with the rest of the North Carolina cases").[5] Here, in short, there is no reason to depart from the general rule that covenants restricting an employee from working in a capacity unrelated to that in which he or she worked for the employer are overbroad and unenforceable. *See CopyPro,* 754 S.E.2d at 192-93.[6]

### b. The Non-Compete Cannot Be Blue-Penciled To Make It Enforceable

A covenant must rise or fall integrally. *Henley Paper Co. v. McAlister,* 117 S.E.2d 431, 435 (N.C. 1960). "When the language of a covenant not to compete is overly broad, North Carolina's 'blue pencil' rule severely limits what the court may do to alter the covenant." *Hartman,* 450 S.E.2d at 920. At most, "[a] court . . . may choose not to enforce a distinctly separable part of a covenant in order to render the provision

---

[5] Moreover, *Precision Walls* is distinguishable from this case, where the only meaningful proprietary "information and knowledge," 568 S.E.2d at 273, from Dr. Kearns's LabCorp tenure that he could conceivably impart to a competitor consists of his own process for undertaking PGD, which, of course, is now in the public domain. Ex. 1 at ¶ 29; Ex. 2 at 102-107.

[6] The non-compete is unenforceable on at least two additional grounds. First, the territorial restriction is overbroad in precluding Dr. Kearns from competing with LabCorp's subsidiaries and affiliated companies in geographic markets serviced by them, without regard to whether LabCorp or Dr. Kearns serviced those geographic markets during the term of Dr. Kearns's employment. *See Medical Staffing Network,* 670 S.E.2d at 327-28. Second, the agreement prevents Dr. Kearns from owning even an indirect interest in a similar business. Courts routinely reject prohibitions on "direct or indirect" ownership and investment as overbroad. *See Prometheus Group Enterprises, LLC v. Viziya Corp.,* No. 5:14–CV–32–BO, 2014 WL 3854812, *5 (E.D.N.C. Aug. 5, 2014); *VisionAIR,* 606 S.E.2d at 362-63; *Horner Int'l,* 754 S.E.2d at 857.

PGDOCS\6400937

reasonable." *Id.* Here, the overbroad terms in the non-compete are not distinctly separable portions that the Court could blue-pencil without effectively rewriting the covenant. *See Asheboro Paper,* 599 F.Supp.2d at 676. Accordingly, LabCorp's motion for a preliminary injunction that seeks to enforce the non-compete covenant in Section 9(a)(iii) of the Employment Contract should be denied.

### 2. The Non-Solicitation Covenant Is Likewise Overbroad and Unenforceable

For several reasons, the non-solicitation covenant is also overbroad and unenforceable in seeking to prohibit Dr. Kearns from "contacting, soliciting, or communicating with a customer or potential customer of [LabCorp] or its subsidiary or affiliated companies." Ex. 1-D at ¶ 9(a)(i).

First, the non-solicitation fails to identify or define "customers or potential customers." *See id.* North Carolina courts have declined to enforce non-solicitation provisions with similar references to undefined customers on the grounds that they (1) go beyond the scope of the employer's legitimate business interests or (2) are unacceptably vague and nebulous. *See MJM Investigations, Inc. v. Sjostedt,* 2010 WL 2814531, *3 (N.C. App. July 20, 2010); *Hejl v. Hood, Hargett & Assocs.,* 674 S.E.2d 425, 430 (N.C. App. 2009); *see also Farr & Assocs.,* 530 S.E.2d at 882. In *MJM Investigations,* the covenant sought to preclude solicitation of "any client or prospect client" of the plaintiff for the purposes of providing competing services. 2010 WL 2814531, at *3. The court disapproved of the inclusion of unspecified "prospect clients" because it "could potentially

PGDOCS\6400937

refer to prospects at the time the agreement was executed, at the time the defendants left MJM's employ, or someone unknown who only became a prospect during the period of the injunction." *Id.* As such, the court held that "MJM's failure to provide any definition for 'current or prospect client' renders the non-solicitation clause vague and unenforceable" and reversed the trial court's grant of a preliminary injunction based on the non-solicit. *Id.*

Here, the non-solicitation agreement also precludes Dr. Kearns from contacting or soliciting "potential customers" without defining that term. Ex. 1-D at ¶ 9(a)(i). That the prohibition is limited to those "with whom [Dr. Kearns] had contact while employed at [LabCorp]," *id.*, does not cure the overbreadth problem. For example, the non-solicitation could be read to prohibit Dr. Kearns from soliciting someone he taught at Johns Hopkins during his employment with LabCorp even though he did not know the student was a potential customer of LabCorp at the time or might become a potential customer during the term of the preliminary injunction. *See id.*

Second, the non-solicit is overbroad and unenforceable because it purports to prohibit not only Dr. Kearns's active solicitation of customers and potential customers, but also his passive acceptance of business from LabCorp's customers who contact him. Specifically, Section 9(a)(i) prohibits, *inter alia*, all direct or indirect "*contact . . . and communicat[ion] with* a customer or potential customer" for purposes of providing PGD services. Ex. 1-D at ¶ 9(a)(i) (emphasis added). In effect, the covenant precludes Dr. Kearns from merely accepting calls from LabCorp's customers who were unsatisfied

PGDOCS\6400937

with LabCorp's services and preferred the services of AdvaGenix. *See id.* Thus, the non-solicitation restricts the customers' freedom to choose their PGD provider.

While not specifically addressed by any North Carolina court, courts in other jurisdictions have rejected as overbroad or contrary to public policy similar efforts to prohibit mere acceptance of business from a former employer's customers. *See, e.g.*, *Curtis 1000, Inc. v. Martin,* 197 Fed.Appx. 412, 420 (6th Cir. 2006) (applying Georgia law); *Gen. Assurance of Am., Inc. v. Overby-Seawell Co.,* 893 F.Supp.2d 761, 775-76 (E.D. Va. 2012) (same); *Robert Half, Int'l v. Murray,* 2008 WL 2625857, *12 (E.D. Cal. June 25, 2008); *Cardiovascular Surg. Specialists, Corp. v. Mammana,* 61 P.3d 210, 214 (Okla. 2002) (covenant precluding physician from accepting referrals, including patients who specifically requested physician, was unenforceable); *Bayly, Martin & Fay, Inc. v. Pickard,* 780 P.2d 1168, 1175 (Okla. 1989) (absent "active solicitation . . ., restraint on an insurance agent's dealings with former clients is unenforceable"). Thus, by prohibiting all communication and contact between Dr. Kearns and the customers and potential customers of LabCorp, the non-solicit goes well beyond protecting LabCorp's customer relationships from Dr. Kearns's interference and should not be enforced.

Further, the ambiguous reference to "customer or potential customer of [LabCorp] or its subsidiary or affiliated companies," Ex. 1-D at ¶ 9(a)(i), renders the non-solicit unenforceable. The clause could be read to prohibit solicitation of LabCorp's customers and potential customers and the affiliates and subsidiaries of those customers and potential customers. *See id.* Because LabCorp may have no relationship with the affiliates

PGDOCS\6400937

and subsidiaries of its customers, the non-solicit either is clearly overbroad or, at best, ambiguous, meaning in either event that LabCorp cannot make "the requisite showing that it is likely to succeed on the merits." *Novacare Orthotics,* 528 S.E.2d at 922.

Finally, like the non-compete, the non-solicit cannot be blue-penciled to make it enforceable. The overbroad and undefined provisions regarding any customer or potential customer of LabCorp or its subsidiary or affiliated companies is not a distinct, separable term. Accordingly, the non-solicitation covenant exceeds the scope of LabCorp's legitimate business interests and should not be enforced.

### III.    LabCorp Cannot make a Clear Showing of Irreparable Harm

LabCorp claims (Mot. 18) it has been irreparably harmed by the loss of several customers and a loss of goodwill to AdvaGenix. LabCorp, however, has no one but itself to blame for these losses. The evidence shows that AdvaGenix undertook PGD for one-time LabCorp customers only after those clinics discovered that LabCorp's contract lab either would not or could not timely complete their cases and implored AdvaGenix to step in. Ex. 2 at 135-38, 188-90, 264. Those clinics are lost to LabCorp whether or not AdvaGenix ever performs another PGD case, so a preliminary injunction cannot repair LabCorp's self-inflicted harm and hence should not be entered. *Southtech Orthopedics, Inc. v. Dingus*, 428 F. Supp. 2d 410, 418 (E.D.N.C. 2006) (no irreparable harm where

PGDOCS\6400937

"plaintiff's loss of customers and/or goodwill is just as likely attributable to plaintiff's own strategic business decisions as defendant's competitive conduct").[7]

## IV.   The Balance of Equities Tips Against LabCorp and in Favor of the Patients it Cannot Serve

LabCorp and its contract lab are incapable of or unwilling to perform the very kinds of difficult or time-sensitive cases that have always been and continue to be Dr. Kearns's niche in the industry. Ex. 2 at 101, 267-68. Overwhelmingly, these are the cases LabCorp has lost and will continue to lose to AdvaGenix. *Id.* at 264. While the entry of a preliminary injunction will not restore a single one of these cases to LabCorp, it could well leave emotionally vulnerable IVF patients without the best possible care. *Id.* at 265. The equities, in short, tip in favor of those patients, and against LabCorp.

## V.   The Public Interest Similarly Favors IVF Patients Over LabCorp

LabCorp argues (Mot. 20) that the public interest favors the enforcement of valid contracts, and so it does. But, even if one were to assume, *arguendo*, that LabCorp's restrictive covenants were valid, two other public interests countervail and overcome the interest in enforcing contracts: first, North Carolina's "disfavor[]" of restrictive covenants, *Superior Performers, Inc. v. Meaike*, No. 1:13CV1149, 2014 WL 1412434, at

---

[7] And, even assuming *arguendo* that LabCorp could prove that it lost other occasional cases to AdvaGenix for reasons other than its contract lab's inherent limitations, money damages would fully compensate LabCorp for any such loss, leaving LabCorp unable to clearly show irreparable harm. *Southtech Orthopedics*, 428 F. Supp. 2d at 422 (there is no "irreparable harm . . . [where] alleged loss of customers, sales, and market share is compensable in money damages").

PGDOCS\6400937

*16 (M.D.N.C. Apr. 11, 2014) (where the court weighed both interests); and, second, the public's "vital interest in quality and efficient health care," *Southtech Orthopedics*, 428 F. Supp. 2d at 421 (finding that this interest outweighed the public "interest in ensuring that contracts are enforced"). The public interest, in short, is best served by denying LabCorp's motion for a preliminary injunction.

## CONCLUSION

For the foregoing reasons, LabCorp's motion for a preliminary injunction should be denied.

Respectfully submitted this 5th day of January, 2015.

> _____*/s/*Mark Vasco_____
> Mark Vasco (N.C. Bar #27048)
> mark.vasco@bryancave.com
> Margaret K. Thies (N.C. Bar #39801)
> peggy.thies@bryancave.com
> BRYAN CAVE LLP
> One Wells Fargo Center
> 301 S. College Street, Suite 3900
> Charlotte, NC 28202
> Tel: (704) 749-8999
> Fax: (704) 749-8990
>
> Maury S. Epner, Esquire
> Selzer Gurvitch Rabin Wertheimer Polott
>  & Obecny, PC
> 4416 East West Highway, Suite 400
> Bethesda, Maryland 20814-4568
> (301) 986-9600
> Email: mepner@sgrwlaw.com
>
> *Counsel for William G. Kearns*

PGDOCS\6400937

## CERTIFICATE OF SERVICE

I have this 5th day of January, 2015 filed electronically the within and foregoing Opposition to LabCorp Motion for a Preliminary Injunction and a copy of the same will be served electronically upon the following attorneys of record via the Court's CM/ECF system:

> Patricia T. Bartis
> pattibartis@parkerpoe.com
> Jennifer H. Dupuy
> jenniferdupuy@parkerpoe.com
> PARKER POE ADAMS & BERNSTEIN LLP
> 301 Fayetteville Street, Suite 1400
> P.O. Box 389
> Raleigh, NC 27602-0389
>
> Robert I. Steiner
> rsteiner@kelleydrye.com
> KELLEY DRYE & WARREN LLP
> 101 Park Avenue
> New York, NY 10178
>
> *Counsel for Laboratory Corporation of America Holdings*

_____/s/ Margaret K. Thies_____
Margaret K. Thies

PGDOCS\6400937