IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| LABORATORY CORPORATION OF | ) | |
|---|---|---|
| AMERICA HOLDINGS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 1:14cv1029 |
| v. | ) | |
| | ) | |
| WILLIAM G. KEARNS, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION
AND ORDER OF PRELIMINARY INJUNCTION**

THOMAS D. SCHROEDER, District Judge.

Before the court is the motion of Plaintiff Laboratory Corporation ("LabCorp") to preliminarily enjoin its former employee, Defendant William G. Kearns, Ph.D., from competing with it in alleged violation of his contract of employment. (Docs. 3, 17.) The parties have submitted an evidentiary record, and the court held a hearing on the motion on January 12, 2015. For the reasons set forth herein, LabCorp's motion will be granted in part and denied in part.

**I. BACKGROUND**

**A. Factual Background**

Pursuant to Rule 65(d)(1)(A) of the Federal Rules of Civil Procedure, the court finds the following facts for purposes of the present motion.

Kearns is an associate professor in the Department of

Obstetrics and Gynecology at the Johns Hopkins School of Medicine in Baltimore, Maryland. (Doc. 22-1 (Kearns Decl.) ¶ 1.) In 2002, he and other partners formed the Shady Grove Center for Preimplantation Genetics, LLC ("Shady Grove Center" or "the Center"). (Id. ¶ 5.) Kearns owned approximately seven percent of the business and served as the Center's director. (Id.)

Around a year after forming the company, Kearns met Richard Leach, Ph.D. (Id. ¶ 6.) The two began collaborating on a method to increase the likelihood of successful pregnancies for women undergoing in vitro fertilization. (Id. ¶¶ 7–11.) By 2006, the two men believed they had developed a patentable process for achieving this goal, so they set out that process in a provisional patent application filed with the United States Patent and Trademark Office on or about September 26, 2006. (Id. ¶ 11.) The process aimed to improve preimplantation genetic diagnosis ("PGD") by a method of testing the cells of newly formed embryos for genetic abnormalities. (Id. ¶¶ 12–14.) To this day, Kearns still uses this process, generally referred to as "microarray" testing, though he sometimes uses another equally effective method generally known as "next generation sequencing." (Id. ¶¶ 15–16.)

In 2007, LabCorp approached the Shady Grove Center about acquiring the company. (Id. ¶ 18.) LabCorp provides a suite of reproductive services, including PGD testing. (Doc. 5 (Schmalz Decl.) ¶¶ 3–6.) Like the Shady Grove Center, LabCorp provides PGD

services to fertility clinics. (Id. ¶¶ 5–6.) LabCorp was interested in acquiring the Shady Grove Center, in part, to acquire its goodwill and customer relationships. (Id. ¶ 12.)

In negotiations to purchase the Center, LabCorp indicated that it would only be interested in the acquisition if Kearns stayed on as director. (Kearns Decl. ¶ 19.) LabCorp sought to have Kearns sign an employment contract with restrictive covenants. (Id.) Initially, Kearns refused because the covenants would have prohibited him from continuing to pursue his patent. (Id.) Ultimately, the parties negotiated around this obstacle. Consequently, in July 2007, LabCorp entered into an agreement (the "Purchase Agreement") to buy substantially all of the assets of the Shady Grove Center.[1] (Id. ¶ 22; Schmalz Decl. ¶ 11; Doc. 22-1 Ex. 1B.)

Also in July 2007, and effective as of the Purchase Agreement, Labcorp and Kearns executed an Employment Agreement ("Employment Agreement"), which retained Kearns as Director, Pre-Implantation Genetics Services of LabCorp at an annual salary of $150,000.00. (Doc. 5-1 ¶ 1.) Relevant here, the Employment Agreement contained the following covenants:

9.  Restrictive Covenants.

(a) . . . during the term of this Contract and for a period of one (1) year following the termination or expiration

---

[1] LabCorp paid $3.2 million for the Center, of which Kearns had a 7% interest. (Schmalz Decl. ¶ 11.)

of this Contract, Employee will not, without the prior
written consent of the Corporation:

(i)   directly or indirectly through a subordinate,
      co-worker, peer, or any other person or entity
      contact, solicit or communicate with a
      customer or potential customer of Corporation
      or its subsidiary or affiliated companies
      with whom Employee has had contact while
      employed at Corporation or its subsidiary and
      affiliated companies for the purpose of (x)
      offering, selling, licensing or providing the
      same or substantially similar assays,
      commercial medical testing or anatomical
      pathology services offered and/or provided to
      such customer or potential customer by the
      Corporation or its subsidiary and affiliated
      companies or (y) influencing said customer's
      or potential customer's decision on whether
      to purchase or use such assays, commercial
      medical testing or anatomical pathology
      services offered by the Corporation or its
      subsidiary and affiliated companies . . . .

                  *    *    *

(iii) directly or indirectly own, invest in,
      consult for, be employed by or otherwise
      engaged by any person, trade or business
      either (x) involved in the research and
      development, licensing, production,
      distribution, or sale of preimplantation
      genetic diagnosis and testing that directly
      competes with the Corporation or any of its
      subsidiary and affiliated companies in the
      same geographic markets serviced by them or
      (y) supplies, services, advises or consults
      with a person, trade or business involved in
      the research and development, licensing,
      production, distribution, or sale of
      preimplantation genetic diagnosis and
      testing that directly competes with the
      Corporation or any of its subsidiary or
      affiliated companies in the same geographic
      markets serviced by them, except that nothing
      in this Contract shall prohibit Employee from
      holding not more than three [sic] (3%) of the

4

> outstanding shares of a publicly traded company whether or not engaged in business activities that compete with the business activities of the Corporation and its subsidiary and affiliated companies.

(Doc. 5-1 ¶¶ 9(a)(i), (iii).)

The Employment Agreement further provided that these restrictions "shall not apply to Employee's actions, efforts or business pursuits with respect to the Patent referenced in Paragraph 8(b)." (Id. ¶ 9(b).)[2] Paragraph 8(b), in turn, described the patent as

> the provisional patent application for "Method for In Vitro Fertilization (IVF) and Genetic Testing of Human Embryos for Chromosome Abnormalities, Single Gene Mutations, Segregating genetic Disorders in Families, and Mitochondrial Mutations" filed Septembar [sic] 22, 2006; applicants: William G. Kearns & Richard A Leach; Serial No. to be assigned ("Patent")."

(Id. ¶ 8(b).)

Beginning around July 2007, Kearns ran LabCorp's PGD testing lab, doing the same work he had previously performed for the Shady Grove Center, including the process for PGD testing described in his provisional patent application. (Kearns Decl. ¶ 26.) His responsibilities and duties also included sales and marketing of PGD services, as well as research and development of new genetic tests for LabCorp. (Schmalz Decl. ¶ 24.) Such duties involved

---

[2]    The Purchase Agreement contained a similar carve-out from its restrictive covenants. (See Doc. 22-1 Ex. 1B ¶ 1.2; Doc. 22-1 Ex. 1C ¶ 2.) LabCorp has only sued, however, to enforce the restrictive covenants in Kearns' Employment Agreement.

Kearns' meeting with various PGD customers for LabCorp. (Kearns Dep. at 109, Doc. 22-2.[3]) Kearns also attended LabCorp meetings concerning formulation and implementation of sales strategies, including pricing strategies and analysis of competitive threats. (Id. ¶ 26; Kearns Dep. at 91–93, Doc. 20-1.) In this regard, he was involved in setting the pricing of PGD services for LabCorp. (Kearns Dep. at 114–17, Doc. 22-2.) Kearns' LabCorp team provided services to between thirty and forty fertility clinics. (Schmalz Decl. ¶ 25; Kearns Dep. at 91–93, Doc. 20-1.)

There are many competitors in the PGD testing industry, and LabCorp relies on the relationships it develops with customers to maintain and expand its clientele of fertility clinics. (Kearns Dep. at 93, Doc. 20-1; Schmalz Decl. ¶ 7.) Similarly, LabCorp's sales strategies and plans are confidential information shared only with employees who require the information to perform their jobs. (Schmalz Decl. ¶ 8.) Kearns knew this information and developed relationships with LabCorp's customers. (Id. ¶¶ 54–56.)

On September 24, 2007, Kearns and Leach filed a permanent application for a patent based on their PGD microarray testing process. (Kearns Decl. ¶ 27.) For the next several years, during his tenure at LabCorp, Kearns worked with Leach in an attempt to

_____

[3] The parties have separately submitted various portions of Kearns' deposition transcript. The court will reference the docket number to show the proper source.

secure a patent based on this permanent application.  (Id. ¶ 28.)
In 2012, however, the two decided to abandon pursuit of the patent,
determining that the expense was too great to bear.  (Id. ¶ 29.)
In July 2012, the United States Patent and Trademark Office issued
a Notice of Final Rejection of the patent application (Doc. 1-3),
and in March 2013 deemed it abandoned.  (Doc. 1-4.)

In January 2014, Kearns was invited to breakfast by two of
his supervisors, Michael Davis and Peter Paperhausen.  (Kearns
Decl. ¶¶ 30–31.)  They told him that LabCorp had decided to close
the PGD lab in May 2014 and to contract with a lab in New Jersey
for all PGD services.  (Id. ¶¶ 31, 33.)  The contract lab would be
performing the actual PGD testing, but Kearns would be the primary
contact for LabCorp's customers and patients and overseer for the
interpretation and reporting of the contract lab's test results.
(Schmalz Decl. ¶ 28.)  As a result, Kearns would be working from
home.  (Kearns Decl. ¶ 33.)  Kearns was very upset by the decision
and considered resigning.  (Id. ¶¶ 31–32.)  His new supervisor,
Jeffrey Schmalz, asked Kearns to stay with LabCorp to manage the
transition.  (Id. ¶ 32.)  Kearns felt obliged to the fertilization
clinics and their patients to ensure a successful transition.
(Id.)

LabCorp's decision left Kearns without a lab to continue his
research and to train his medical school students.  (Id.)
Therefore, in April 2014, he formed a limited liability company

called AdvaGenix and a laboratory of the same name, which would provide a place to continue his research and teaching. (Id.) AdvaGenix is wholly owned by William Kearns and Laura Kearns as joint tenants with right of survivorship. (Doc. 5-2 at 14.) AdvaGenix's operating agreement states that its business purposes include "(i) provid[ing] genetic services for *in vitro* fertilization clinics and to do all things related thereto; [and] (ii) provid[ing] genetic services for any fetus or individual requiring genetic testing." (Id. at 1-2.)

Kearns told Schmalz that he was forming the lab. (Kearns Decl. ¶ 33.) He did not tell Schmalz that the lab would serve a commercial purpose, however. (Kearns Dep. at 195, Doc. 22-2.) At this point, Kearns was not using the lab to undertake commercial PGD testing of any kind, whether for LabCorp's clients or anyone else, nor was he soliciting LabCorp's clients for work. (Kearns Decl. ¶ 34.) Kearns believed, however, that under the patent carve-out to his restrictive covenants, he could have immediately begun competing against LabCorp. (Id.)

In May 2014, LabCorp asked Kearns to amend his Employment Agreement. (Kearns. Decl. ¶ 35.) On May 12, 2014, he and LabCorp executed an amendment which, among other things, changed his title to "Technical Director and Business Development for Pre-Implantation Genetics" and increased his salary $190,000.00, with bonus opportunities; however, the amendment did not change the

restrictive covenants.[4]  (Id. ¶¶ 36–37; Doc. 5-1.)

Kearns began managing the transition to the contract lab for LabCorp, calling and visiting clinics to convince them that they would receive the same quality of service from the contract lab. (Kearns Decl. ¶ 35.)   However, the transition was not without wrinkles.   In June 2014, the contract lab refused to test certain PGD samples submitted on the grounds that the saline solution in the LabCorp-provided kits made it difficult to run the necessary tests.   (Id. ¶ 39.)   Kearns brought the problem to Schmalz's attention.  (Id.)  Schmalz asked Kearns what should be done to fix the problem.  (Id. ¶ 40.)   Kearns told Schmalz that he could run the PGD testing in his own lab, the one he had told Schmalz about previously.  (Id.)  Schmalz directed Kearns to run the test in his own lab, for this case and the twelve problematic cases like it. (Id.; Kearns Dep. at 197, Doc. 22-2.)   Kearns did so but did not charge LabCorp for the work.  (Kearns Dep. at 201, Doc. 22-2.)

During this exchange, Kearns did not explicitly tell Schmalz that his lab was capable of commercially running PGD testing.  But, to be legally permitted to sign these clinical case reports, Kearns' lab had to be certified and licensed for diagnostic work, which meant that the lab was not purely for research.  (Kearns Decl. ¶ 40; Kearns Dep. at 197–98, Doc. 22-2.)  Therefore, Schmalz

_____

[4] The amended Employment Agreement will nevertheless be referred to as the Employment Agreement.

knew that Kearns' new lab was capable of providing commercial PGD services.

Later, in the summer of 2014, several clinics complained to Kearns about LabCorp's contract lab, finding it incapable of undertaking or unwilling to undertake certain cases. (Kearns Decl. ¶¶ 41-42.) Some of LabCorp's clients abandoned LabCorp and asked Kearns to perform the tests in his AdvaGenix lab. (Id. ¶ 42.)[5] Although Kearns may have made some effort to persuade the clinics to send their cases to LabCorp, he ultimately performed many of these cases for about ten different clinics throughout the summer and fall of 2014, for a total of about 100 cases by October 28. (Id. ¶ 42; Doc. 20-2 at 79-104.)[6]

In October 2014, one of LabCorp's customers told a LabCorp employee that Kearns had visited the customer on his own behalf, not LabCorp's, and had informed the customer that Kearns was forming his own lab for PGD testing and would soon be resigning from LabCorp. (Schmalz Decl. ¶ 29; Kearns Dep. at 146-48, Doc. 20-1.)[7] LabCorp commenced an investigation and learned that Kearns had developed a new business entity called AdvaGenix. (Schmalz

---

[5]  It is unclear how the clients were aware that Kearns was operating his AdvaGenix lab.

[6]  Currently, LabCorp represents that it has addressed the problems that arose during the transition to the contract lab. (Doc. 25 (Supp. Rotthoff Decl.) ¶¶ 3-9.)

[7]  It is unclear how LabCorp learned this information, or who it was at LabCorp that learned it.

Decl. ¶¶ 31–33.)

Schmalz invited Kearns to a meeting on October 28, 2014, that Schmalz said would concern budgeting and planning. (Kearns Decl. ¶ 45; Schmalz Decl. ¶ 34.) In fact, the meeting was arranged to discuss Kearns' formation of AdvaGenix. (Kearns Decl. ¶ 45; Schmalz Decl. ¶ 35.) At the meeting, Schmalz accused Kearns of hiding his company from LabCorp. (Kearns Decl. ¶ 45.) Kearns told Schmalz that he already told him about the lab twice before. (Id.) Schmalz told Kearns that the restrictive covenants prohibited Kearns from running this lab. (Id. ¶ 47.) Kearns claimed that he was permitted to do so under the Employment Agreement's patent carve-out. (Id.) Kearns was placed on administrative leave and was required to turn over his LabCorp cell phone and laptop. (Id.; Schmalz Decl. ¶ 39.) Shortly thereafter, on November 17, 2014, LabCorp fired him for cause. (Kearns Decl. ¶ 49; Schmalz Decl. ¶ 43.)

On the day of his termination, Kearns sent an email to various recipients describing services that his AdvaGenix lab would be offering — services which LabCorp also offers. (Schmalz Decl. ¶¶ 44–45.) After Kearns was terminated, one of LabCorp's customers sent LabCorp an email explaining that it had "elected to continue [its] care with Dr. Kearns at his new practice." (Id. ¶ 52; Doc. 5-6.)

By the time of his October 28 meeting, Kearns had performed

PGD testing on around 100 cases for customers who had been clients of LabCorp but had left LabCorp during the transition because the contract lab allegedly could not or would not run some of their cases. (Kearns Dep. at 138, 179, Doc. 20-1; see Doc. 20-2 at 79–104.) For the period from July 5, 2014, to December 20, 2014, Kearns ran PGD testing on 180 cases. (See Doc. 20-2 at 79–104.)

### B.   Procedural History

On December 9, 2014, LabCorp filed the present action against Kearns, claiming breach of the restrictive covenants in his Employment Agreement and breach of his fiduciary duties to LabCorp. (Doc. 1)   LabCorp moved for a temporary restraining order and expedited discovery against Kearns. (Doc. 2.)   Kearns appeared, through counsel, and on December 17, 2014, consented to the entry of an order for expedited discovery and to be temporarily restrained from soliciting LabCorp customers or competing until January 12, 2015, at which time the court would hold a hearing on whether a preliminary injunction should be entered. (Doc. 17.)

Kearns has since filed an answer, denying LabCorp's claims, and asserted counterclaims for LabCorp's breach of the Employment Agreement and violation of the North Carolina Wage and Hour Act., N.C. Gen. Stat. § 95.25.1, et seq. (Doc. 23.)

LabCorp's motion for preliminary injunction is fully briefed and supported by affidavits and excerpts from Kearns' deposition. Following the court's January 12, 2015 hearing, the motion is ready

for decision.

## II. ANALYSIS

### A.    Standard of Review

When a party moves for preliminary injunctive relief, the burden of showing that such "extraordinary" relief should issue rests with the movant.  Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20, 24 (2008).  Movants must make a "clear showing" of four pre-requisites:  "(1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm, (3) the balance of hardships tips in their favor, and (4) the injunction is in the public interest."  Pashby v. Delia, 709 F.3d 307, 320 (4th Cir. 2013) (citing Winters, 555 U.S. at 20).  The court must "separately consider each Winter factor" to determine whether each has been "satisfied as articulated."  Id. at 320-21.  A party's failure on any element precludes injunctive relief from issuing.  See Cantley v. W. Va. Reg'l Jail & Corr. Facility Auth., 771 F.3d 201, 207 (4th Cir. 2014).

### B.    Likelihood of Success on the Merits

LabCorp must show that it will likely succeed on its claim for breach of the restrictive covenants.  This requirement "is far stricter" than just requiring LabCorp to "demonstrate only a grave or serious question for litigation."  Real Truth About Obama, Inc. v. FEC, 575 F.3d 342, 347 (4th Cir. 2009), cert. granted & judgment vacated on other grounds, 559 U.S. 1089 (2010), and adhered to in

part, <u>Real Truth About Obama, Inc. v. FEC</u>, 607 F.3d 355 (4th Cir. 2010). But LabCorp need not show a "certainty" of success. <u>Pashby</u>, 709 F.3d at 321 (citing 11A Charles Alan Wright et al., <u>Federal Practice and Procedure</u> § 2948.3 (2d ed. 1995)).

In its complaint, LabCorp alleges that Kearns has breached two restrictive covenants in his Employment Agreement: a non-solicitation covenant and a non-competition covenant. (Compl. ¶ 56.) Kearns argues that neither is enforceable and that, even if it is, he is not in breach due to the so-called "patent carve-out" exclusion. Because this carve-out, if valid, would shield him from the restrictive covenants altogether, the court turns to it first.

### 1. Applicability of the Patent Carve-Out

During the acquisition of the Shady Grove Center, LabCorp and Kearns negotiated a carve-out to the restrictive covenants in Kearns' Employment Agreement. The arrangement had several aspects.

First, while the parties agreed generally that LabCorp would have a right to Kearns' inventions arising out of his company work (Doc. 5-1 ¶ 8(a)), Kearns' pending provisional patent application was exempted (<u>id.</u> ¶ 8(b)). Second, in delineating Kearns' duties, the parties agreed that Kearns may "engage in actions, efforts or business pursuits with respect to" the patent, so long as such actions did not "interfere" with his general duties and

14

responsibilities to the company. (Id. ¶ 1(b).) Finally, in what the parties term the "carve-out" for the current motion, they agreed explicitly that the restrictive covenants "shall not apply to [Kearns'] actions, efforts or business pursuits with respect to" the provisional patent application. (Id. ¶ 9(b).)

LabCorp argues that the patent carve-out has no application here because Kearns abandoned pursuit of the patent. (Doc. 19 at 16.) Kearns argues for a broader interpretation of the clause. Specifically, he argues that what has been carved out is his use of the PGD testing process described in the patent application itself, regardless of whether he actually received a patent for his invention. (Doc. 22 at 7.)

Kearns' construction is unpersuasive. The patent carve-out excludes Kearns' "actions, efforts [and] business pursuits with respect to the patent"; indeed, as LabCorp conceded at the hearing, had the patent been acquired, the carve-out would have exempted licensing the technology, even to LabCorp. But no patent was acquired, and Kearns concedes that he has not pursued it during the times relevant to the motion. Under the plain terms of the carve-out, therefore, Kearns' conduct in conducting PGD testing services does not qualify. Moreover, Kearns' interpretation conflicts with his essential duties under the Employment Agreement and cannot reflect what the parties reasonably intended when they executed it. As director of preimplantation genetic services,

Kearns was responsible for "operating, managing, and overseeing laboratory services for [PGD] testing"; "marketing and developing business opportunities for such services"; and "researching and developing assays for [PGD] testing." (Doc. 5-1 ¶ 1(a).) If the process Kearns was already using and developing when he joined LabCorp was itself exempt from the restrictive covenants, as Kearns contends, then LabCorp would have employed, in a management position no less, a person already free to compete against it. Kearns' interpretation would essentially render the restrictive covenants meaningless <u>ab initio</u>.[8] This court should not adopt an interpretation of the Employment Agreement that effectively eliminates material provisions. <u>See</u> <u>Marcoin, Inc. v. McDaniel</u>, 320 S.E.2d 892, 897 (N.C. Ct. App. 1984) (rejecting proposed construction that would "render meaningless" a material provision of a contract absent reason why such a "strained construction [was] more reflective of the parties' intent than a more reasonable construction guided by traditional principles").

Kearns' primary argument — that the provision carves out the process described in the patent — finds no support in the language of the Employment Agreement. The carve-out exempted Kearns'

---

[8] Kearns freely admits that his interpretation would have this effect. In his declaration, he admits, "Although, under my patent carve-out, I could immediately have devoted my AdvaGenix lab to competing against LabCorp in undertaking PGD, it frankly did not occur to me to do so, as I would simply have been competing with myself (doing precisely the same work wearing two different hats)." (Kearns Decl. ¶ 34.)

actions "with respect to the Patent referenced in Paragraph 8(b)."
(Doc. 5-1 ¶ 9(b).)  In paragraph 8(b), the term "Patent" is defined
not as Kearns' process for PGD testing, nor as a process that he
hoped to develop in the future.  Rather, the term "Patent" was
defined in more concrete terms as "the provisional patent
application" for Kearns' PGD process.  The parties were free to
define "Patent" in reference to the process itself.  That they did
not do so is evidence that they did not intend to do so.[9]

Kearns developed a competing business while working at
LabCorp, servicing only his former LabCorp customers, and he
continued operating the business once he departed.  Because Kearns'
only argument against breach relies on the patent carve-out, the
court finds that LabCorp has made a clear showing of breach.  The
court turns now to whether the restrictive covenants are
enforceable.

### 2.    Enforceability of Paragraph 9(a)(i)

Kearns argues that both covenants, paragraphs 9(a)(i) and
9(a)(iii), are unreasonably broad and unenforceable.

Both parties refer to the covenant of paragraph 9(a)(i) as a
non-solicitation agreement.  As noted, the paragraph provides
that, during the term of the Employment Agreement and for one year

---

[9]  Although Kearns has not argued that the carve-out should be construed
against LabCorp, it would be inappropriate to do so in this case.  The
provision is not ambiguous and, even if it were, Kearns conceded at the
hearing and in his declaration that he specifically negotiated the
clause.  (See Kearns Decl. ¶¶ 18-22.)

after its termination or expiration, Kearns would not, without LabCorp's prior written consent,

> directly or indirectly through a subordinate, co-worker, peer, or any other person or entity contact, solicit or communicate with a customer or potential customer of Corporation or its subsidiary or affiliated companies with whom Employee has had contact while employed at Corporation or its subsidiary and affiliated companies for the purpose of (x) offering, selling, licensing or providing the same or substantially similar assays, commercial medical testing or anatomical pathology services offered and/or provided to such customer or potential customer by the Corporation or its subsidiary and affiliated companies or (y) influencing said customer's or potential customer's decision on whether to purchase or use such assays, commercial medical testing or anatomical pathology services offered by the Corporation or its subsidiary and affiliated companies . . . .

(Doc. 5-1 ¶ 9(a)(i).)

The covenant prohibits Kearns from contacting, soliciting, or communicating with LabCorp's customers and potential customers with whom he had contact while working for the company. The parties agree that the covenant not only prohibits active solicitation, but also prohibits Kearns from passively accepting work from his prior contacts made at LabCorp. (Doc. 22 at 18-19; Doc. 24 at 6-7.) They argue that this issue has not been addressed by any North Carolina court, and both rely on law from other jurisdictions.

Contrary to the suggestion of the parties, the enforceability of this provision can be determined by North Carolina law. North Carolina courts evaluate non-competes and non-solicitation

agreements through the same lens.  See, e.g., United Labs., Inc.
v. Kuykendall, 370 S.E.2d 375, 379–80 (N.C. 1988) (explaining the
law for restrictive covenants, including both non-competes and
non-solicitation agreements).  So, although the parties label this
provision as a non-solicitation covenant, where the provision
purports to bar passive acceptance of work from a previous client,
it constitutes a customer-contact non-compete because it has the
same effect of barring the former employee from competing for his
former clients.

North Carolina courts have long stated that restrictive
covenants between an employer and an employee are not viewed
favorably.  See Kadis v. Britt, 29 S.E.2d 543, 546 (N.C. 1944);
VisionAIR, Inc. v. James, 606 S.E.2d 359, 362 (N.C. Ct. App. 2004).
Because they restrain the ability of employees to secure gainful
employment and of employers to find qualified workers, restrictive
covenants "must be no wider in scope than is necessary to protect
the business of the employer."  VisionAIR, 606 S.E.2d at 362
(quoting Manpower of Guilford County, Inc. v. Hedgecock, 257 S.E.2d
109, 114 (N.C. Ct. App. 1979)).  When a non-compete is unreasonably
broad, courts are "severely" limited in their ability to blue-
pencil offensive provisions.  Hartman v. W.H. Odell & Associates,
Inc., 450 S.E.2d 912, 920 (N.C. Ct. App. 1994).  A court "at most
may choose not to enforce a distinctly separable part of a covenant
in order to render the provision reasonable.  It may not otherwise

revise or rewrite the covenant." <u>Id.</u>

The burden of showing enforceability rests with LabCorp, as the party seeking to restrain trade. <u>Hartman</u>, 450 S.E.2d at 916. To be enforceable under North Carolina law, a restrictive covenant must be (1) in writing; (2) made as part of an employment agreement; (3) based on valuable consideration; (4) reasonable as to both time and territory; and (5) designed to protect a legitimate business interest of the employer. <u>Young v. Mastrom, Inc.</u>, 392 S.E.2d 446, 448 (N.C. Ct. App. 1990) (citing <u>A.E.P. Industries v. McClure</u>, 302 S.E.2d 754, 760-61 (N.C. 1983)). The covenants' restrictions cannot be "wider in scope than is necessary" to protect an employer's legitimate business interests. <u>Asheboro Paper & Packaging, Inc. v. Dickinson</u>, 599 F. Supp. 2d 664, 671 (M.D.N.C. 2009) (quoting <u>VisionAIR</u>, 606 S.E.2d at 362).

### a.   Legitimate Business Interests

To determine the reasonableness of the restrictions, the court must first identify what business interests LabCorp can legitimately protect. LabCorp has identified two types of business interests that both restrictive covenants are designed to protect: (1) customer relationships and (2) confidential, proprietary pricing information. (Doc. 19 at 15.)

The North Carolina Supreme Court has outlined the contours of an employer's legitimate interests in its goodwill and customer relationships:

> [P]rotection of customer relationships and good will
> against misappropriation by departing employees is well
> recognized as a legitimate protectable interest of the
> employer. The greater the employee's opportunity to
> engage in personal contact with the employer's customer,
> the greater the need for the employer to protect these
> customer relationships. This theory, which is often
> referred to as the "customer contact" theory, is most
> applicable where the employee is the sole or primary
> contact between the customer and the employer.

Kuykendall, 370 S.E.2d at 381 (citations omitted). Employers can

also have legitimate business interests in other confidential or

proprietary information that their employees learn and use during

their time of employment. See A.E.P. Indus., Inc. v. McClure, 302

S.E.2d 754, 763 (N.C. 1983).

At this stage, the court finds that LabCorp has demonstrated

legitimate business interests in protecting both its customer

goodwill, confidential pricing information, and confidential

pricing strategy.

### b.    Overbreadth of Paragraph 9(a)(i)

Kearns argues that paragraph 9(a)(i) is wider than necessary

to protect LabCorp's customer relationships for two reasons.

First, he argues that the phrase "customer or potential customer"

is too vague to be enforceable. Kearns cites to three cases from

the North Carolina Court of Appeals for support: MJM

Investigations, Inc. v. Sjostedt, No. COA09-596, 2010 WL 2814531

(N.C. Ct. App. July 20, 2010), Hejl v. Hood, Hargett & Assocs.,

Inc., 674 S.E.2d 425 (N.C. Ct. App. 2009), and Farr Assocs., Inc.

<u>v. Baskin</u>, 530 S.E.2d 878 (N.C. Ct. App. 2000).

The theme common to all three cases, however, is absent here. Each case found the covenant unreasonably broad because it was not limited to customer contacts made by the employee himself during his period of employment. <u>See</u> <u>MJM Investigations</u>, 2010 WL 2814531 at *4 ("The language of the agreement clearly extends the non-solicitation clause to cover 'clients' and, in particular, 'prospect clients' with which Defendants had never made contact."); <u>Hejl</u>, 674 S.E.2d at 307 ("But in the case before us, where the Agreement reaches not only clients, but potential clients, and extends to areas where Plaintiff had no connections or personal knowledge of customers, the Agreement is unreasonable."); <u>Farr Assocs.</u>, 530 S.E.2d at 882 ("The covenant in question prevents Mr. Baskin from working for <u>all</u> of Farr's current or recent clients, regardless of where the client is located, whether he had any contact with them, or whether he even knew about them.").

In North Carolina, covenants prohibiting competition for a former employer's customers are only enforceable when they prohibit the employee from contacting customers with whom the employee actually had contact during his former employment. <u>Farr Assocs.</u>, 530 S.E.2d at 883 ("[A] client-based limitation cannot extend beyond contacts made during the period of the employee's employment."). Paragraph 9(a)(i) explicitly limits the covenant

to customers "with whom [Kearns] has had contact while employed at" LabCorp. Therefore, the court finds that the covenant properly limits its use of the term "customer."

Second, Kearns asserts that this covenant is overbroad because it prohibits him from providing competing services to the subsidiaries and affiliates of the customers with whom he had actual contact during his employment. (Doc. 22 at 18–19.) Kearns cites no authority for this proposition, whether from North Carolina or elsewhere. Nor does he make any meaningful attempt to show how this issue should render the covenant unenforceable. "It is not the role or the responsibility of the Court to undertake the legal research needed to support or rebut a perfunctory argument." Hayes v. Self-Help Credit Union, No. 1:13-CV-880, 2014 WL 4198412, at *2 (M.D.N.C. Aug. 22, 2014). Kearns' conclusory argument, without more, cannot overcome LabCorp's otherwise clear showing on this issue.

For these reasons, the court finds that LabCorp has made a clear showing, at this time, that paragraph 9(a)(i) is enforceable.[10]

### 3. Enforceability of Paragraph 9(a)(iii)

Kearns also argues that paragraph 9(a)(iii), a more typical

---

[10] Kearns has not questioned the time restriction of this covenant, so the court does not address it here. Cf. Farr Assocs., 530 S.E.2d at 881 (addressing application of a so-called "look-back period").

non-compete provision, is unreasonably broad and unenforceable. As noted, it provides that during the Employment Agreement and for one year after its termination or expiration, Kearns would not, without LabCorp's prior written consent,

> directly or indirectly own, invest in, consult for, be employed by or otherwise engaged by any person, trade or business either (x) involved in the research and development, licensing, production, distribution, or sale of preimplantation genetic diagnosis and testing that directly competes with the Corporation or any of its subsidiary and affiliated companies in the same geographic markets serviced by them or (y) supplies, services, advises or consults with a person, trade or business involved in the research and development, licensing, production, distribution, or sale of preimplantation genetic diagnosis and testing that directly competes with the Corporation or any of its subsidiary or affiliated companies in the same geographic markets serviced by them, except that nothing in this Contract shall prohibit Employee from holding not more than three [sic] (3%) of the outstanding shares of a publicly traded company whether or not engaged in business activities that compete with the business activities of the Corporation and its subsidiary and affiliated companies.

(Doc. 5-1 ¶ 9(iii).) Kearns argues that LabCorp has not demonstrated a legitimate interest in prohibiting his ownership of or investment in a direct competitor or supplier of a direct competitor. (Doc. 22 at 14–15.) The court agrees.

The general rule on indirect ownership is set out in VisionAIR, Inc. v. James, 606 S.E.2d 359 (N.C. Ct. App. 2004). In that case, the non-compete provided that, after termination, the former employee could not "own, manage, be employed by or otherwise participate in, directly or indirectly, any business similar to

Employer's . . . within the Southeast" for two years.  Id. at 362.
The court held that prohibiting indirect ownership of a similar
firm would also prevent the former employee from "even . . .
holding interest in a mutual fund invested in part in a firm
engaged in business similar to [the former employer's].  Such vast
restrictions on [the former employee] cannot be enforced."  Id. at
362-63.  The rule from VisionAIR has been applied by numerous other
courts, both state and federal.  See, e.g., Horner Int'l Co. v.
McKoy, 754 S.E.2d 852, 857 (N.C. Ct. App. 2014) ("Finally, the
[non-compete agreement] purports to bar Defendant from having even
an indirect financial interest in such a business, a condition
specifically rejected by the Court in VisionAIR . . . ."); Superior
Performers, Inc. v. Meaike, No. 1:13CV1149, 2014 WL 1412434, at
*10 (M.D.N.C. Apr. 11, 2014); CNC/Access, Inc. v. Scruggs, 2006
NCBC 20 ¶ 51 (N.C. Super. Ct. Nov. 15, 2006) ("By prohibiting
Scruggs from even indirect ownership of a competing company, the
covenant goes farther than is necessary to prevent Scruggs from
competing for the customers of CNC/Access.  It therefore cannot be
seen as protecting a legitimate business interest of the
employer.").

Paragraph 9(a)(iii) extends to indirect ownership and
investment in both (1) businesses involved in PGD testing that
directly compete with LabCorp, and (2) companies that supply,
service, advise, or consult with businesses involved with PGD

testing that directly compete with LabCorp. LabCorp has not justified such broad restrictions here.

The first provision would prohibit Kearns from investing in a startup trying to develop new PGD technology for commercial exploitation. Likewise, under the second provision, Kearns could not even invest in a paper company that supplies paper to a PGD testing laboratory. This covenant sweeps too broadly and, at this stage, LabCorp has not clearly justified this apparent overreach.

This covenant does contain an exception to the restraint on investment: "[N]othing in this Contract shall prohibit [Kearns] from holding not more than three [sic] (3%) of the outstanding shares of a publicly traded company whether or not engaged in business activities that compete with the business activities of the Corporation and its subsidiary and affiliated companies." (Doc. 5-1 ¶ 9(a)(iii).) LabCorp argued at the hearing that this exception was meant to address the concern raised in VisionAIR. But this exception is not wide enough. LabCorp has offered no legitimate business that can only be protected by limiting investment to publicly traded companies or to only three percent of such companies. This restriction could also bar ownership through a mutual fund or various other mechanisms of passive investment.

In light of these deficiencies, the court need not examine the provision further and holds that LabCorp has not made a clear

showing at this point that paragraph 9(a)(iii) is enforceable.[11]

### 4. Reformation

LabCorp argues that, should the court find any of the restrictive covenants unreasonably broad and unenforceable, it should reform them to meet the parameters of the law.

Under North Carolina law, courts are narrowly limited in their power to reform overbroad restrictive covenants in employment agreements: "If a contract by an employee in restraint of competition is too broad to be a reasonable protection to the employer's business it will not be enforced. The courts will not rewrite a contract if it is too broad but will simply not enforce it." Whittaker Gen. Med. Corp. v. Daniel, 379 S.E.2d 824, 828 (N.C. 1989); see also Noe v. McDevitt, 45 S.E.2d 121, 123 (N.C. 1947) ("The Court cannot by splitting up the territory make a new contract for the parties — it must stand or fall integrally."). The courts are authorized, "at most," only "to enforce a distinctly separable part of a covenant in order to render the provision

---

[11] Kearns also argues that this covenant is unenforceable for two other reasons. First, he contends that, because paragraph 9(a)(iii) prohibits him from working for a direct competitor in a capacity unrelated to his capacity at LabCorp, it is overbroad. The only exception, he argues, is found in Precision Walls, Inc. v. Servie, 568 S.E.2d 267, 273 (N.C. Ct. App. 2002) ("Thus, plaintiff's legitimate business interest allows the covenant not to compete to prohibit employment of any kind by defendant with a direct competitor."), which he contends has been limited to its facts by other decisions. Second, Kearns argues that the geographic scope of paragraph 9(a)(iii) is unreasonably broad. Because the court has found that LabCorp has failed to demonstrate the validity of the covenant on another ground, the court need not reach these alternative arguments.

reasonable.  It may not otherwise revise or rewrite the covenant."
Hartman, 450 S.E.2d at 920.

LabCorp argues that this court has special authority to blue-pencil paragraph 9(a)(iii) because the parties agreed in the Employment Agreement that a reviewing court could reform an unreasonable covenant to make it reasonable.  (Doc. 24 at 9-10.) LabCorp is correct that the parties did so agree:

> [I]f any provision contained in this Contract shall be adjudicated to be invalid or unenforceable because such provision is held to be excessively broad as to duration, geographic scope, activity or subject, such provision shall be deemed amended by limiting and reducing it so as to be valid and enforceable to the maximum extent compatible with the applicable laws of such jurisdiction, such amendment only to apply with respect to the operation of such provision in the applicable jurisdiction in which the adjudication is made.

(Doc. 5-1 ¶ 14(d).)

No North Carolina court has directly addressed whether parties to an employment agreement can empower a court to modify a restrictive covenant that it could not modify absent such a provision.  For support, LabCorp cites a recent North Carolina Court of Appeals case, Beverage Systems of the Carolinas, LLC v. Associated Beverage Repair, LLC, 762 S.E.2d 316 (N.C. Ct. App. 2014), notice of appeal filed, No. 316A14 (N.C. Sept. 5, 2014). In that case, the plaintiff sold his business to the defendants. Id. at 318-19.  As part of the asset purchase agreement, the plaintiff-seller agreed to a restrictive covenant.  Id. at 319.

The parties agreed that, should a court find the restrictive covenants unreasonably broad and unenforceable, the court would be allowed to reform the covenants "to cover the maximum period, scope and area permitted by law." Id.

The trial court found the covenants unenforceable and refused to modify them. Id. The Court of Appeals agreed that the restrictive covenants in the asset purchase agreement were unreasonably broad. Id. at 321. However, the court held that the trial court erred by refusing to reform them to the maximum, reasonable extent permitted under law. Id. at 321–22. The court held that, because the parties' asset purchase agreement expressly authorized reformation, "the trial court's ability to revise the non-compete is not subject to the restrictions of the 'blue pencil doctrine' which prohibits a trial court from revising unreasonable provisions in non-compete agreements." Id. at 321.

The court noted that the issue as it saw it — "the right of a trial court to revise the provisions of a non-compete based on the express language of the contract *for the sale of a business*" — was one of first impression. Id. at 322 (emphasis added). The court limited its holding to that context:

> *Given the fact that non-competes drafted based on the sale of a business are given more leniency than those drafted pursuant to an employment contract* since the parties are in relatively equal bargaining positions, the trial court should not have held the entire non-compete unenforceable nor should the trial court's power to revise and enforce reasonable provisions of the non-

> compete be limited under the "blue pencil
> doctrine." . . . In contrast, *pursuant to the sale of*
> *a business*, these parties, who were at arms-length with
> equal bargaining power, agreed to allow the trial court
> to revise the non-compete to make it reasonable, and the
> trial court should have done so.

Id. at 321–22 (emphasis added). All the policy justifications
offered for the holding were also limited to the context of the
sale of a business. Id. at 322–23.

As a federal court sitting in diversity and applying North
Carolina law, this court is obliged to apply the jurisprudence of
North Carolina's highest court, the Supreme Court of North
Carolina. See Private Mortgage Inv. Servs., Inc. v. Hotel & Club
Assocs., Inc., 296 F.3d 308, 312 (4th Cir. 2002). When that court
has not spoken directly on an issue, this court must "predict how
that court would rule if presented with the issue." Id. The
decisions of the North Carolina Court of Appeals are the "next
best indicia" of what North Carolina's law is, though its decisions
"may be disregarded if the federal court is convinced by other
persuasive data that the highest court of the state would decide
otherwise." Id. (quoting Liberty Mut. Ins. Co. v. Triangle Indus.,
Inc., 957 F.2d 1153, 1156 (4th Cir. 1992)).

At this stage, it is not clear that North Carolina courts
would extend Beverage Systems to the employment context. The
court's holding appears limited to the sale of a business. In
contrast, the North Carolina Supreme Court has long emphasized

that "[c]ontracts restraining employment are looked upon with disfavor." <u>Kadis</u>, 29 S.E.2d at 546; <u>accord</u> <u>Farr Assocs.</u>, 530 S.E.2d at 881.  Historically, North Carolina's blue-pencil rule has been characterized as both "strict" and "severe." <u>Beverage Sys.</u>, 762 S.E.2d at 321; <u>Hartman</u>, 450 S.E.2d at 920.

In sum, even assuming that the North Carolina Supreme Court would accept the rule from <u>Beverage Systems</u>, LabCorp has not made a clear showing that North Carolina's appellate courts would extend the holding to employment agreements.  For this reason, the court will not attempt to reform paragraph 9(a)(iii), but will simply not enforce it.[12]

### C.  Irreparable Harm

Having shown a likelihood of success on the merits concerning the breach and enforceability of paragraph 9(a)(i), LabCorp must also clearly show that it will suffer irreparable harm without preliminary injunctive relief.  Irreparable harm is suffered "when monetary damages are difficult to ascertain or are inadequate." <u>Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.</u>, 22 F.3d 546, 551–52 (4th Cir. 1994).  And when the failure to grant preliminary relief creates a permanent loss of customers to a competitor or the loss of goodwill (or the likelihood of such losses), the irreparable injury prong is

---

[12]  Although this case involved the sale of a business, LabCorp has not sought to enforce the restrictive covenants in the Purchase Agreement.

satisfied.  See id. at 552; Signature Flight Support Corp. v.
Landow Aviation Ltd. P'ship, 442 F. App'x 776, 785 (4th Cir.
2011)[13].  In this case, LabCorp has made a clear showing that it
has already lost customers to Kearns' new AdvaGenix lab, customers
that may never return.

Kearns argues these customers have been lost because of
LabCorp's transition to using the contract lab and that there is
no irreparable harm where an employer's "loss of customers and/or
goodwill is just as likely attributable to [the employer's] own
strategic business decisions as [the former employee's]
competitive conduct."   (Doc. 22 at 19–20 (quoting Southtech
Orthopedics, Inc. v. Dingus, 428 F. Supp. 2d 410, 418 (E.D.N.C.
2006)).)  This argument is unpersuasive.

At this stage, LabCorp has made a clear showing that, without
preliminary injunctive relief, it will likely continue to lose
customers through Kearns.  The record demonstrates that Kearns has
contributed to LabCorp's loss of customers by not informing LabCorp
of the alleged customer complaints and providing it an opportunity
to remedy any concerns.  LabCorp has also provided evidence that
it (through its contract lab) has corrected the problems that are
complained of.  (Doc. 25-1 ¶¶ 4-10.)  And although LabCorp no

---

[13]  Unpublished opinions of the Fourth Circuit are not precedential but
are cited for the weight they generate by the persuasiveness of their
reasoning.  See Collins v. Pond Creek Mining Co., 468 F.3d 213, 219 (4th
Cir. 2006).

longer performs the PGD testing in-house, it still has legitimate interests in its customers serviced by the contract lab because LabCorp aims to maintain these customer relationships in order to interpret the lab results for them and to sell these customers other related services that LabCorp provides in-house.

Therefore, the court finds that LabCorp has made a clear showing of irreparable harm absent a preliminary injunction.

### D. Balance of Hardships

In this case, the relative balance of hardships between the parties clearly favors LabCorp. Kearns is being enjoined from doing that which he promised not to do. Kuykendall, 370 S.E.2d at 380. There has been no showing that he will not be able to seek gainful employment if paragraph 9(a)(i) of the Employment Agreement is enforced. Indeed, he enjoys employment as faculty at Johns Hopkins School of Medicine, which he can continue. (Doc. 22-1 ¶ 1.) With enforcement of only paragraph 9(a)(i), Kearns can compete as long as his customers are not LabCorp's clients and prospects with whom he dealt personally. Moreover, as counsel for LabCorp conceded at the hearing, LabCorp does not service customers in the western half of the United States, leaving many prospective purchasers unaffected by this preliminary injunction.

Kearns argues that the balance of hardships favors him because the only clients LabCorp has lost are those for whom its contract lab would not or could not do the required testing. Enforcing the

33

covenants, Kearns argues, would not restore any lost client and may leave fertility patients without the best possible care. (Doc. 22 at 20.) To the extent he argues causation based on LabCorp's inability to perform, he overlooks his failure to have brought the issue to LabCorp's attention to permit it to address the situation — problems LabCorp now says have been fixed. To the extent he argues the public interest is better served with him as a competitor, Kearns misunderstands this element of the analysis. The balance of hardships is weighed as between the parties to this case. The public interest is a separate analysis. See infra.

The court finds that LabCorp has made a clear showing that the balance of hardships tips in its favor.

**E. Public Interest**

Finally, LabCorp must show that a preliminary injunction is in the public interest. Ordinarily, as Kearns concedes (Doc. 22 at 21), the enforcement of valid restrictive covenants is in the public interest. Kuykendall, 370 S.E.2d at 380. Kearns argues, however, that the public interest would be better served in this case by denying the preliminary injunction because of the public's "vital interest in quality and efficient health care." (Doc. 21 at 22 (quoting Southtech Orthopedics, Inc. v. Dingus, 428 F. Supp. 2d 410, 421 (E.D.N.C. 2006)).)

While Kearns surely identifies a legitimate interest, he has made no showing that there is a shortage of providers of this type

of genetic testing or that enforcement of the covenants he agreed to will deny anyone quality and efficient health care. In fact, Kearns admits that, if he is restrained from providing PGD services, numerous other competent laboratories remain in the marketplace to do so. (Kearns Dep. at 265–66, Doc. 22-2.) Therefore, the court finds that the public interest is served by enforcing paragraph 9(a)(i) of the Employment Agreement.

## III. Security

Under Rule 65(c) of the Federal Rules of Civil Procedure, a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."

The parties did not address the issue of an adequate bond in their briefing, and thus the court raised the issue at the hearing. Counsel for LabCorp contended that an appropriate bond would be Kearns' annual $190,000 salary at LabCorp, pro-rated for the time remaining on his restrictive covenants, which "expire" on November 17, 2015 — a total of "around $150,000." This suggestion misunderstands Rule 65(c) because it does not represent the injury Kearns would incur were he found to have been wrongfully restrained. A proper bond must take into account the loss Kearns would suffer from not being able to compete for his former LabCorp customers.

Kearns' counsel argued that his client charges approximately $2500 for each PGD procedure and would bring in gross revenue of about $500,000 to $1,000,000 per year. He also contends he has additional, unspecified fixed and variable costs for equipment, employee salaries, and rent. Counsel argued that, taking into account the gross revenue and costs, a bond should be set around "a couple million." However, this estimate contemplated enforcement of both restrictive covenant paragraphs and is not limited to the alleged loss from enforcement of paragraph 9(a)(i) only.

The court must determine the "proper" amount of a bond based on the record evidence. See Pashby, 709 F.3d at 332; Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis, 35 F.3d 1134, 1142 (7th Cir. 1994) (finding that the district court must provide an explanation for its decision to set the bond at the chosen figure so the reviewing court can determine whether the bond imposed was "within the range of options from which one could expect a reasonable trial judge to select" (internal quotation marks omitted); 11A Charles A. Wright, Federal Practice and Procedure § 2954 (3d ed. 2013) ("[T]he district court is required to make factual findings to support its decision for setting a bond at a particular amount to allow for appropriate appellate review."). The bond is effectively "the moving party's warranty that the law will uphold the issuance of the injunction." Edgar v. MITE Corp.,

457 U.S. 624, 649 (1982) (Stevens, J., concurring). The burden of establishing the bond amount rests with the party to be restrained, who is in the best position to determine the harm it will suffer from a wrongful restraint. <u>Philips Electronics N. Am. Corp. v. Hope</u>, 631 F. Supp. 2d 705, 724 n.14 (M.D.N.C. 2009); <u>Int'l Equity Investments, Inc. v. Opportunity Equity Partners Ltd.</u>, 441 F. Supp. 2d 552, 566 (S.D.N.Y. 2006) ("[T]he burden is on the party seeking security to establish a rational basis for the amount of the proposed bond."), <u>aff'd</u>, 246 F. App'x 73 (2d Cir. 2007).

In this case, the value to be calculated is the loss to Kearns reasonably attributable to the enforcement of paragraph 9(a)(i) for the approximately ten-month period remaining on his restrictive covenants. In the five-month period from July 15, 2014, to December 15, 2014, Kearns (through his limited liability company AdvaGenix) performed PGD testing on 155 cases, an average of 31 cases per month. (<u>See</u> Doc. 20-2 at 79–104.) Therefore, for the approximately 10 months remaining on Kearns' restrictive covenant, the court projects that Kearns could have analyzed about 310 cases. At $2500 per PGD case (<u>see</u> Kearns Dep. at 180, Doc. 22-2), the projected lost gross revenue would be about $775,000.

Because this figure represents lost revenue and does not take into account Kearns' ability to solicit work from customers with whom he did not have contact during his LabCorp employment, it may overstate his loss from a wrongful restraint. Yet, LabCorp has

37

offered no rational basis for opposing the figure, either in its briefing or at the hearing on its motion. Given this apparent acquiescence, the court deems $775,000 to be a proper bond amount.[14] However, should either party conclude that a different figure would be proper, it may move for adjustment of the bond amount while the preliminary injunction is still in effect. See Rathmann Grp. v. Tanenbaum, 889 F.2d 787, 790 (8th Cir. 1989); 13 Moore's Federal Practice - Civil § 65.50 ("A party may move the court to increase or decrease the amount of security so long as the restraint or injunction is in effect.").

## IV. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that Plaintiff LabCorp's motion for a preliminary injunction (Docs. 3, 17) be GRANTED in part and DENIED in part, and that Defendant Kearns be PRELIMINARILY ENJOINED as follows:

Through November 16, 2015, Defendant Kearns, his agents, servants, employees, attorneys, and those persons in active concert or participation with him shall not, without the prior written consent of LabCorp, directly or indirectly through a subordinate, co-worker, peer, or any other person or entity

---

[14] At least one court has noted that an understated bond could cause irreparable harm on the ground that "the damages for an erroneous preliminary injunction cannot exceed the amount of the bond." Mead Johnson & Co. v. Abbott Labs., 201 F.3d 883, 888 (7th Cir. 2000).

contact, solicit, or communicate with a customer or potential customer of LabCorp or its subsidiary or affiliated companies with whom Kearns had contact while employed at LabCorp or its subsidiary and affiliated companies for the purpose of either (1) offering, selling, licensing, or providing the same or substantially similar assays, commercial medical testing, or anatomical pathology services offered and/or provided to such customer or potential customer by LabCorp or its subsidiary and affiliated companies, or (2) influencing said customer or potential customer's decision on whether to purchase or use such assays, commercial medical testing, or anatomical pathology services offered by LabCorp or its subsidiary and affiliated companies.

IT IS FURTHER ORDERED that, pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, this Preliminary Injunction shall only become effective when Plaintiff LabCorp gives security to the Clerk of Court in the amount of $775,000.

/s/   Thomas D. Schroeder
United States District Judge

January 30, 2015
5:20 p.m.
Winston-Salem, N.C.